IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 98-10194

---

CARDINAL TOWING & AUTO REPAIR, INC.;
DAVID MATOKE, Individually,

                                    Plaintiffs-Appellants,

        versus


CITY OF BEDFORD, TEXAS, a Municipal Corporation;
RICK HURT, Mayor of City of Bedford in his official
and individual capacity; BECKY GREIN, City Council
Member in her official and individual capacity; LISA
DALY, City Council Member in her official and
individual capacity; STEPHEN PEAK, City Council
Member in his official and individual capacity;
CHARLES OREAN, City Council Member in his
official and individual capacity; DANNY MCDOWELL,
City Council Member in his official and individual
capacity; LEAHMON CHAMBERS, City Council
Member in his official and individual capacity;
JIM R. SIMPSON, Chief of Police in his official
and individual capacity; B&B WRECKER SERVICES, INC.,

                                    Defendants-Appellees.

---

Appeal from the United States District Court for the
Northern District of Texas

---

July 22, 1999

Before GARWOOD, DAVIS and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

    Plaintiffs-appellants Cardinal Towing & Auto Repair, Inc. and

its owner David Matoke (collectively, Cardinal) sued defendants-appellees—the City of Bedford, Texas, the members of the City Council, the City's Police Chief and B&B Wrecker Services, Inc. (all appellees collectively, the City)—complaining of the City's 1995 towing ordinance and the 1996 award of the City's towing contract thereunder to defendant-appellee B&B Wrecking Services, Inc. (B&B). The suit alleged preemption by 49 U.S.C. § 14501(c) and intentional racial discrimination. The district court granted summary judgement for the City. We affirm.

## Facts and Procedural History

The City of Bedford—located outside of Fort Worth—has a population of about 45,000. The Bedford police have the authority to call tow trucks to remove vehicles on public streets that are abandoned or disabled in accidents. These "police tows" were historically handled using a rotation system. Local towing companies that applied and met certain requirements were placed on a police list, and a police tow job would go to the company whose turn it was. The towed vehicle would be stored at the tower's lot and the owner would ultimately pay for the service. For a number of reasons, in November 1995 the City decided to abandon this system and instead contract with a single company to perform all of the tows requested by the City police. Accordingly, the City repealed the previous statutory scheme and passed the here-challenged ordinance directing that the City's non-consensual City

2

police tows be handled by the recipient of the contract with the City.  As before, the owner of the vehicle would actually pay for the service.  The ordinance did not affect non-consensual tows requested by private property owners—property owners remained free to strike agreements with any towing company they wished; nor did it affect situations in which the owner of a disabled car was available and expressed a preference for a particular company at the scene of the accident.[1]  The ordinance thus limited itself to purely non-consensual situations in which the Bedford police requested a tow.

The City drafted contract specifications and solicited bids. The evidence demonstrates that none of the City defendants were aware at the time these specifications were drafted that David Matoke was an African-American (or of the race of the owner(s) of B&B).  Applicants were required to comply with a number of requirements, the most significant of which were a guarantee of response time within fifteen minutes and access to a class eight wrecker. Class eight wreckers are large towing vehicles able to remove tractor trailer trucks.  Cardinal, B&B and another company submitted bids to the City.  Cardinal's bid stated it was "minority owned."  Cardinal averred below that it had "made arrangements to acquire" a class eight wrecker and stated in its bid that it would take some time to put the wrecker in service.  In the interim, it

---

[1]    Nor did the ordinance apply to tows requested by, for example, state police officers.

3

stated that it would be able to call on a class eight wrecker owned by another company, Beard's Towing. A letter from Beard's was attached, in which access to a wrecker was confirmed. However, the letter reflects that Beard's was only able to guarantee a response time averaging forty-five minutes to an hour. The City Council in February 1996 voted to award the contract to B&B. The members of the City Council testified that at that time they were unaware of the race of either Matoke or B&B's owner(s). After the award of the contract, Cardinal protested, claiming that it had been discriminated against. In the wake of these allegations, the City decided to rebid the contract. The second set of bid specifications contained some additional requirements, including ownership of a class eight wrecker, maintenance of an office at the company's vehicle storage facility, and computerized record keeping. The specifications were later amended by raising the required insurance level. Cardinal's second bid stated that it was in the process of acquiring a class eight wrecker and suggested usage of Beard's in the interim. Cardinal also claimed that it was in the process of establishing compliance with the computerized records and office at the storage location requirements and both would be completed a month and a half after the bid was submitted.

The City Council in September 1996 again awarded the contract to B&B. Cardinal filed suit in the Northern District of Texas on February 19, 1997, requesting a declaratory judgement that the City's police tow contracting ordinance constituted regulation

related to the price, route, or service of a motor carrier with respect to the transportation of property and was thus preempted under 49 U.S.C. § 14501(c). The complaint also sought damages for intentional racial discrimination under section 1981 and section 1983. On November 4, 1997, the City filed for summary judgement. Cardinal responded by moving for partial summary judgement on the preemption issue. On January 9, 1998, the district court granted summary judgement for the City. This appeal followed.

## Discussion

We review a district court's grant of summary judgment employing the standard of review it employed. *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 725 (5th Cir. 1995). Summary judgment must be affirmed when the non-moving party has failed to demonstrate that a material issue of fact is present. In reviewing the record, we must view all facts in the light most favorable to the nonmovant. We review questions of law *de novo*. *Id*.

Cardinal's first and principal argument (to which the vast majority of its brief is devoted) is that the district court erred in refusing to find the Bedford ordinance preempted under federal law. It claims that the ordinance and the contract awarded pursuant to it constituted regulation or a provision having the force and effect of law governing ground transportation, and is thus barred under the express preemption clause contained in 49 U.S.C. § 14501(c). The City claims that the ordinance was not

5

regulation, but rather an ordinary contracting decision of a proprietary nature and thus is outside the scope of section 14501(c) preemption. In the alternative, the City argues that if the ordinance is regulation, it is exempted from preemption under section 14501(c)(2)(A)'s exemption for safety related regulation. We find it unnecessary to address the application of the exemption, since we conclude that the City's actions here were proprietary and did not constitute the type of regulation covered in the statute's preemption clause. We also find that Cardinal's race discrimination claim lacks merit.

I. Preemption by 49 U.S.C. § 14501(c)

Under the Supremacy Clause of the Constitution, "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. Federal law preempts state law under the clause whenever 1) Congress has expressly preempted state action, 2) Congress has installed a comprehensive regulatory scheme in the area, thus removing the entire field from the state realm, or 3) state action directly conflicts with the force or purpose of federal law. *See Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335 n.1 (5th Cir. 1995) (*en banc*). Preemption of municipal ordinances is governed under the same standards as would apply to a state law. *See Wisconsin Pub. Intervenor v. Mortier*, 11 S.Ct. 2476, 2482 (1991). However, when

6

preemption is invoked to prevent a state or municipality from wielding its traditional police powers, congressional intent to displace that authority must be "clear and manifest." *See California v. ARC America Corp.*, 109 S.Ct. 1661, 1665 (1989). The setting of the terms and conditions governing municipal contracts constitutes a traditional police power. *See Atkin v. State of Kansas*, 24 S.Ct. 124, 127 (1903).

In 1994, Congress moved to deregulate the motor carrier industry. Central to this effort was a section preempting most state and local regulation. *See* 49 U.S.C. § 14501(c) (codifying the FAA Authorization Act of 1994, Pub.L. No. 103-305, § 601(c), as amended by the ICC Termination Act of 1995, Pub.L. No. 104-88 § 103). Cardinal maintains that the City's actions are preempted by this provision due to a conflict both with the statute's express preemption clause and the spirit of the statute. The statute establishes that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). The 1995 amendment—which specifically referenced towing—indicates that towing companies performing nonconsensual tows are "motor carriers." *See* 49 U.S.C. § 14501(c)(2)(C) (establishing limited exemption for price regulation of "for-hire motor vehicle transportation by a tow truck"). *Cf., e.g., 426*

*Bloomfield Avenue Corporation v. City of Newark*, 904 F.Supp. 364 (D.N.J. 1995) (concluding under pre-amendment law that tow trucks are not within terms of the clause). It is also clear that the ordinance and contract are "related" to the route and service of a motor carrier "with respect to the transportation of property." Barring the successful invocation of one of the statute's exemptions, then, the City's actions would appear to be expressly preempted.

The City argues, however, that its actions are not regulatory, and thus cannot be preempted. The clause only preempts a "law, regulation, or other provision having the force and effect of law." The City maintains that the ordinance and contract specifications here were designed only to procure services that the City itself needed, not to regulate the conduct of others. Such innocuous market participation, it maintains, does not constitute a law, regulation, or provision having the force and effect of law under section 14501(c). We agree.

A. Proprietary action and *Boston Harbor*

The law has traditionally recognized a distinction between regulation and actions a state takes in a proprietary capacity—that is to say, actions taken to serve the government's own needs rather than those of society as a whole. This distinction is most readily apparent when the government purchases goods and services its operations require on the open market. Thus while the dormant

8

commerce clause prevents state interference with interstate commerce, a state is allowed to favor its own citizens when it acts as a "market participant" and not a regulator of third parties. *See, e.g., White v. Massachusetts Council of Construction Employers, Inc.*, 103 S.Ct. 1042, 1044-45 (1983) (municipality's requirement that fifty percent of workers on City-funded construction project be residents of the City did not automatically violate the dormant commerce clause). This distinction has been recognized in preemption cases. The Supreme Court has found that when a state or municipality acts as a participant in the market and does so in a narrow and focused manner consistent with the behavior of other market participants, such action does not constitute regulation subject to preemption. *See Building and Construction Trades Council v. Associate Builders and Contractors of Massachusetts/ Rhode Island, Inc.*, 113 S.Ct. 1190, 1196 (1993) ("*Boston Harbor*") (preemption not applicable). When, however, a state attempts to use its spending power in a manner "tantamount to regulation," such behavior is still subject to preemption. *See Wisconsin Department of Industry, Labor and Human Relations v. Gould*, 106 S.Ct. 1057, 1062-63 (1986).

States have methods of influencing private conduct unrelated to the state's proprietary functions—and thus potentially disrupting a congressional plan—at their disposal that extend beyond traditional overt regulation. One such method is deployment

of a state's spending power in a manner calculated to encourage or discourage such private behavior. In *Gould*, the Court announced that attempts to leverage the spending power to achieve regulatory goals could trigger preemption. The action challenged in *Gould* was a Wisconsin statute that barred the state from contracting with employers who had been repeatedly sanctioned by the NLRB. The state conceded that this requirement was instituted primarily to deter labor law violations generally, and the statute allowed for the bar to be triggered solely by misconduct that occurred on contracts performed outside the state on behalf of parties other than the state itself. Moreover, the provision applied to all of the state's future contracting decisions, not just a particular job where labor peace was at a premium. *See Gould*, 106 S.Ct. at 1061-62. It was thus not difficult to conclude that the state's actions were "tantamount to regulation" and thus subject to preemption under the NLRA. As the Court later noted in *Boston Harbor*, the state's actions in *Gould* could only be understood as an "attempt to compel conformity with the NLRA" that was "unrelated to the employer's performance of contractual obligations to the State." *Boston Harbor*, 113 S.Ct. at 1197.

Following the logic of *Gould*, courts have found preemption when government entities seek to advance general societal goals rather than narrow proprietary interests through the use of their contracting power. Thus attempts by government entities to punish

10

labor and benefits practices they disfavor by withholding contract work have been found preempted by the NLRA and ERISA. *See Chamber of Commerce of United States v. Reich*, 74 F.3d 1322, 1339 (D.C. Cir. 1996) (executive order that barred federal government from contracting with companies that permanently replaced striking workers was preempted by the NLRA); *Air Transport Association of America v. City and Council of San Francisco*, 992 F.Supp. 1149, 1179 (N.D. Ca. 1998) (city ordinance barring contracts with employers that did not offer domestic partner benefits to its entire workforce was preempted by ERISA—city admitted that combating discrimination was ordinance's primary goal and its terms reached well beyond interaction with the city); *Van-Go Transport Co., Inc. v. New York City Board of Education*, 1999 WL 323277 at *9 (E.D.N.Y) (policy of refusing to conditionally certify replacement workers that was applied to all of department's student transport contracts was preempted under NLRA). *See also Keystone Chapter Associated Builders and Contractors, Inc. v. Foley*, 37 F.3d 945, 955 n.15 (3d Cir. 1994) (noting in dicta that proprietary exception could not save minimum wage rule for state contracts since private parties would not ordinarily embrace a policy that increased the cost of contracting without regard to particular circumstances).

Most government contracting decisions do not constitute concealed attempts to regulate, however. In order to function, government entities must have some dealings with the market. While

11

the leverage a state can exert through its spending power and the absence of a true profit motive to restrain government action may create a temptation to take advantage of these interactions to pursue policy goals, the presence of the state in the market cannot automatically be assumed to be motivated by a regulatory impulse. Given the volume of, and obvious need for, interaction between the government and the private sector, the application of preemption in a manner that hobbles state and local governments' purchasing efforts threatens severe disruption.

*Boston Harbor* recognized this reality. In *Boston Harbor*, the Court confronted a situation in which a state agency was under a judicial order to complete a project within a set time frame. To prevent time-consuming work stoppages, the agency agreed to employ a union workforce in exchange for a no-strike guarantee. The Court distinguished *Gould* and found that such proprietary action was not subject to preemption by the NLRB. It found that the agency had focused on the government's own interests—uninterrupted completion to assure compliance with the court order—and had done so by striking the type of labor bargain a private company might have sought in similar circumstances. In contrast to the state's admitted desire to encourage labor compliance as a general matter in *Gould*, the agency was only "attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." *Boston Harbor*, 113 S.Ct. at 1198.

12

Significantly, the state's action was limited to a particular job, and did not penalize bidders for practices on different projects for other clients. *See id.* at 1197 (noting *Gould* "addressed employer conduct unrelated to the employer's performance of contractual obligations to the State"). Under these circumstances, the Court found that the agency's actions were not "tantamount to regulation" and thus not subject to preemption under the NLRA.

Courts have similarly shielded contract specifications from preemption when they applied to a single discreet contract and were designed to insure efficient performance rather than advance abstract policy goals. *See Associated General Contractors of America v. Metropolitan Water District of Southern California*, 159 F.3d 1178, 1183 (9th Cir. 1998) (requirement that contractors on project adhere to a particular collective bargaining agreement that included benefit package was not preempted by ERISA); *Colfax v. Illinois State Toll Highway Authority*, 79 F.3d 631, 634-35 (7th Cir. 1996) (requirement that contractor adhere to area collective bargaining agreement was not preempted by NLRA); *Minnesota Chapter of Associated Builders and Contractors, Inc. v. County of St. Louis*, 825 F.Supp. 238, 243-44 (D. Minn. 1993) (county's requirement that bidders for jail construction contract agree to labor agreement that set benefit levels but also contained nonstrike clause not preempted by ERISA).

B. Proprietary nature of the City's actions

Here, the City acted as a typical private party would act in seeking a towing service, and preemption should not apply. In distinguishing between proprietary action that is immune from preemption and impermissible attempts to regulate through the spending power, the key under *Boston Harbor* is to focus on two questions. First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem? Both questions seek to isolate a class of government interactions with the market that are so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out. Since the answer to both questions here is affirmative, this case is at least on the surface firmly within the realm of *Boston Harbor's* permissible proprietary action.

The City's ordinance and contract specifications had an obvious connection to the City's narrow proprietary interest in its own efficient procurement of services. Selecting a single company to perform the City's tows clarified responsibility, minimized administrative confusion, and allowed for the setting and easy supervision of a unitary quality standard for that particular work

14

for the City.  The specifications in the contract were also obviously related to efficient towing—the key provisions dealt with the City's core speed and reliability concerns, and the other requirements dealt with the type of administrative and legal issues that would be of interest to a private entity—insurance and record keeping.  In light of these facts, Cardinal does not claim, and we cannot find any suggestion, that the City was doing anything else other than setting specifications that would insure the efficient performance of the contract with the City for City police tows.[2]

---

[2]     This narrow focus on the practical can be contrasted with another Texas municipality's approach to tow trucking. *See Harris County Wrecker Owners For Equal Opportunity v. City of Houston*, 943 F.Supp. 711, 730 (S.D. Tex. 1996).  In *Harris*, the court faced a *licensing* scheme governing *both* consensual and nonconsensual tows throughout the City.  A portion of the scheme governed the type of police tows at issue in this case, requiring parties to obtain a special licence—the number of which were limited—before being eligible to conduct such tows.  The district court ultimately found these provisions were preempted.  Licencing schemes do not invite proprietary analysis.  *Cf. Golden State Transit Corp. v. City of Los Angeles*, 106 S.Ct. 1395, 1398 (1986) (City's threat to bar taxi licence renewal in order to influence labor dispute was preempted) *with Boston Harbor*, 113 S.Ct. at 1196 (distinguishing *Golden State* and noting a different case would be presented if the City used taxi services to transport City workers).  The general regulatory impulse behind the portions of the *Harris* ordinances dealing with police tows was in any case obvious given the licensing format and industry-wide scope of the ordinance as a whole.  Given this, it is hardly surprising that the City in *Harris* did not argue that its actions were proprietary and thus shielded from preemption.  That issue was neither before the *Harris* court nor addressed by it.  We note, however, that the *Harris* court found that the "primary motivations" behind the police tow licence scheme were "economics, community development, and social policies."  *Harris*, 943 F.Supp. at 729.  The dominance of these factors in the scheme was demonstrated by the fact that only ten percent of applicants were rejected on the grounds of ability and experience, while fifty-three percent were rejected due to a policy of racial preferences

15

There is no indication that it was trying to generally encourage the possession of class eight wreckers the way the state in *Gould* sought to encourage compliance with the NLRA or the City in *Air Transport* sought to encourage domestic partnership benefits.

Nor do the scope of the ordinance and contractual specifications at issue here call into question the proprietary character of the City's actions. Unlike the attempts of other municipalities to deal with tow truck issues, the City here limited itself only to true nonconsent tows where the owner of the vehicle was unwilling or unable to specify a towing company. *Cf. R. Mayer of Atlanta, Inc. v. City of Atlanta*, 158 F.3d 538, 540-41 (11th Cir. 1998) (permit required for all tows within city); *Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 768-69 (2d Cir. 1999) (rates capped for all tows within city, general licencing requirements imposed on all companies, and system set limiting tows from the scene of an accident to selected companies even if vehicle owner requested another independently). And as in *Boston Harbor*—but unlike *Gould*—the specifications here looked

---

and the applicants' failure to meet more nebulous goals such as community development. *Id.* at 731-32. While private parties might choose to take into account such factors, the ever present temptation to leverage the spending power and thus intrude on congressional design is such that the proprietary exception should be reserved for more archetypical market behavior. *See Boston Harbor*, 113 S.Ct. at 1197 (noting that while private companies might choose to participate in a boycott, such action would trigger preemption if it was engaged in by the state). The presence of such factors in *Harris* might have created an inference of regulatory intent had the question been addressed.

only to the bidder's dealings *with the City*.  Cardinal's failure to guarantee its other customers access to a large wrecker or service within fifteen minutes would have had no impact on its bid if the City had been satisfied it would receive such service.  *Cf. Reich*, 74 F.3d at 1338 (noting effect of executive order would be to force any corporation that hoped to do business with the government to refrain from hiring replacement workers on *all* of its projects).  Finally, the contract specifications here did not apply to all City contracts going forward, but only a single contract for  police tows.  *See Boston Harbor*, 113 S.Ct. at 1198 (noting contract was "specifically tailored to one particular job").  If, for example, the City struck an agreement for the movement of furniture and records to a new government office, the bidding moving companies would not be forced to obtain a class eight wrecker.   Taken together, the limited scope here decisively forecloses an inference that the City sought to change the tow truck industry as a whole, let alone influence society at large.

C. Application of *Boston Harbor* to § 14501(c)

The City's actions here thus would seem clearly entitled to shelter under *Boston Harbor*—as narrowly focused exercises of a proprietary function, they are not subject to preemption.  While no case to our knowledge has specifically applied *Boston Harbor* to section 14501(c), such an application is fully consistent with its reasoning.  And while § 14501(c), unlike the NLRB, has an express

17

preemption clause, so does ERISA. Indeed, the language of ERISA's preemption clause is almost identical to the text here. *See* 29 U.S.C. § 1144(a) (preemption of state law "as they may now or hereafter relate to any employee benefit plan"); § 1144(c)(1) (defining state law as "all laws, decisions, rules, regulations, or other State action having the effect of law"). *Cf*. 49 U.S.C. § 14501(c) (preemption of any "law, regulation or other provision having the force and effect of law").[3] Courts have had little difficulty finding that proprietary state action does not "have the effect of law" under ERISA and thus does not fall within the terms of express preemption. *See Associated General Contractors*, 159 F.3d at 1183 (finding that *Boston Harbor* "applies just as strongly here, for ERISA itself carefully distinguishes between state action in general and state action which has the effect of law"). We find that the same analysis applies under § 14501(c). Not only does the text of the statute allow for a proprietary analysis, by excluding government actions without the force of law it seems to invite it.[4]

---

[3]   To the extent that there is any textual difference between the sections, ERISA's preemption would appear broader. It explicitly references rules and decisions as well as laws and regulations, and only requires that "other State Action" have the "effect" of law, while § 14501(c) requires "force *and* effect". *See* 29 U.S.C. § 1144(c)(1); 49 U.S.C. § 14501(c).

[4]   Cardinal also relies on the amendment to § 14501(c) that allowed price regulation of non-consent tows. *See* 49 U.S.C. § 14501(c)(2)(C) (codifying amendment contained in the ICC Termination Act of 1995, Pub.L. No. 104-88 § 103). The amendment indicates that explicit regulation of the price of nonconsensual tows (including those ordered by private property owners) was

18

Nor does the spirit and purpose of section 14501(c) mandate a different result. Section 14501(c), to be sure, is a deregulatory statute that seeks to encourage market forces. *See, e.g.,* House Conf. Rep. No. 103-677, reprinted in 1994 USCCAN 1676, 1758-59 (purpose of statute is elimination of state and local regulation that reduces competition and curtails expansion of markets). But the free play of market forces was also the congressional prescription for the area of labor law at issue in *Boston Harbor*. *See Boston Harbor*, 113 S.Ct. at 1198. And as the Court noted there—quoting the dissenting opinion of now Justice Breyer below—when a state acts in a proprietary fashion and contracts as a private party would, "it does not 'regulate' the workings of the market forces that Congress expected to find; it exemplifies them." *Id*. at 1199 (quoting 935 F.2d 345, 361 (1st Cir. 1991) (*en banc*) (Breyer, C.J., dissenting)). Allowing a city to contract for city-ordered towing services would seem a prime example of this phenomenon. Because the owner of the vehicle will by necessity be

---

permitted. Cardinal argues that the allowance of price regulation implicitly forbade the City's actions here. But because the amendment applied to private nonconsensual tows, and because it referred to the concept of regulation in a manner consistent with the original language, *see id*. (allows "law, regulation, or other provision" related to price), it is impossible to assume that Congress specifically considered the issue before us and meant to implicitly foreclose even proprietary nonprice governmental action in this area. Preemption of traditional police powers will not be inferred unless congressional intent is clear and manifest. *See California v. ARC America Corp*., 109 S.Ct. 1661, 1665 (1989). Given this requirement, we cannot say that the amendment acts to bar the City's proprietary action.

unable to choose a towing company in nonconsent situations, the only party that can make the type of merit selection inherent in market transactions is the party ordering the tow. In the situations addressed by the ordinance, that party is the City, and by its choosing the company best able to guarantee fast, reliable towing service, the City exemplifies the market forces Congress sought to encourage.

The return to the prior rotation system urged by Cardinal, in contrast, would require the City to hand out towing contracts to a pool of applicants regardless of their relative merits. Such an arrangement is rare in the private sector, and not exactly a paradigm of *laissez faire*. This is especially true since the logic of Cardinal's preemption argument would seem, if accepted, to prevent a municipality from setting threshold standards for entry into the rotational pool. If the City cannot require fast response and heavy towing capacity in forming a single contract, it would seem it would also be barred from imposing a similar requirement on parties seeking to enter the pool. The upshot would be a system in which neither the owner nor the party ordering the tow, when that party is the City, could exercise a meaningful choice between competing providers. Whatever such a system might look like, it assuredly would not resemble the normal workings of a competitive market that Congress sought to encourage. Barring a showing of special circumstances—which Cardinal failed to allege or

20

demonstrate—it appears that the City's actions are not only fully compatible with Congress' desire to foster a free market in ground transportation, they are far more in its spirit than Cardinal's suggested alternative.[5]

D. The City as a consumer of towing services

Cardinal argues that the City's actions here constitute regulation because the City is not really contracting as a consumer of towing services at all—the owner of the vehicle towed, not the party ordering the tow, is the real consumer. This argument has some intuitive resonance. When a police tow occurs, the owner of the vehicle rather than the City pays for the service. The City is not utilizing its spending power at all. It thus could be argued that however skillfully the City has tried to cast the issue in contractual terms, the reality here is the classic regulatory situation of the government imposing itself, without any direct interest, on the interactions between two private parties. However,

---

[5] Cardinal has failed to argue or allege that the structure of the Bedford towing industry involves special circumstances justifying deviation from our general analysis. There may be municipalities in which police tows constitute such an overwhelming portion of the industry that failure to share in the municipality's business forecloses effective competition in other segments of the industry. However, in other municipalities the size of the police tow segment may be such that mechanical rotation regardless of merit would merely atrophy incentives to improve service and leave the private sector inadequately provided for. As the record here furnishes no basis for such an analysis, and Cardinal has made no argument in that respect, we do not address the matter. We do not suggest that undertaking such an analysis would, or would not, be appropriate, or, if so, in what circumstances, if any, it might justify departure from our general section 14.501(c) preemption analysis as to City-ordered nonconsensual tows.

this argument ignores the odd structure of the towing industry. While a portion of the industry functions on quintessential market lines—the type of consensual tow where one calls a truck to have a broken-down car taken to the repair shop—the nonconsensual tows at issue here do not.

As we noted earlier, nonconsensual tows do not involve any opportunity for market interaction on the part of the owner of the vehicle. The real decision is made by the party who ordered the tow, who chooses both to remove the vehicle and the party to perform the service. And whether the ordering party is the City or a private property owner, it seeks out this service in the pursuit of its own interests. For property owners, that interest is typically the freeing of a parking space.[6] For the City, it is the need to maintain traffic flow in the wake of an accident and remove abandoned vehicles blighting their environment. In both cases this interest is hardly abstract. Both need the service performed—if the City were unable to contract with private parties, it would presumably have to purchase and deploy its own tow trucks. And both have a very real desire to obtain the best service possible. They will accordingly select the fastest and most reliable towing company that they are aware of, and towing companies will compete for their business.

---

[6] And the vehicle owner frequently is the party liable for the towing cost in such situations. *See, e.g.,* Texas Trans. Code Ann. §§ 684.012(a), 684.001(1), and 684.053(a)(2).

22

This structure, while somewhat distorted by the fact a third party gets left with the bill, is in its relevant essentials an ordinary market for services. When a private property owner requests the removal of a car from its lot, it is a consumer of towing services and the company it selects is a provider. The owner of the vehicle, who did not request and most likely did not desire this "service," can of course also be viewed as a consumer (and often is also liable for the tow costs, see note 6, *supra*). But in this oddly bifurcated market, the party requesting the tow is undeniably also acting as a consumer, and when the City requests a tow it should be treated as a consumer. We are convinced that the City's role here is of a proprietary nature, notwithstanding the fact that a third party pays for the service.

For the reasons stated, we hold that the City's actions here did not constitute regulation or have the force and effect of law. Accordingly, they are not preempted by section 14501(c). This makes it unnecessary for us to determine whether the statute's preemption exemption for safety regulations, *see* 49 U.S.C. § 14501(c)(2)(A), can be invoked by municipalities, an issue that has created a split between the circuits in cases involving true regulation. *See Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 775 (2d Cir. 1999) (safety exemption applies and shields bulk of municipal regulation from preemption); *R. Mayer of Atlanta, Inc. v. City of Atlanta*, 158 F.3d 538, 545-48 (11th Cir.

23

1998) (terms of statute allow only state, and not municipality, to shelter under exemption). We also need not determine whether the ordinance and contract provisions here were sufficiently motivated by or related to public safety concerns to be eligible for the section 14501(c)(2)(A) exemption.

II. Racial Discrimination

Cardinal also claims that the City discriminated against it because its owner, David Matoke, is an African-American. The specifications were manipulated to exclude it from consideration, Cardinal maintains, and the contract was awarded to B&B even after Cardinal demonstrated it met the heightened specifications. A claim under § 1983 of racial discrimination in hiring is evaluated under the standards of Title VII. *See Tanik v. Southern Methodist University*, 116 F.3d 775 (5th Cir. 1997). Cardinal concedes that there is no direct evidence of discrimination here. To survive summary judgement in a case based on an inference of discriminatory intent, a plaintiff must establish a *prima facie* case. To establish a *prima facie* case, it must be shown that the plaintiff was a member of a protected group who applied for a position he was qualified for, was denied, and the position was awarded to a party outside of the plaintiff's class. *See Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087 (5th Cir. 1994). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to demonstrate a permissable alternative motivation, which, if

24

established, the plaintiff then bears the burden of rebutting. *Id*.

The City claims that Cardinal has failed to make out a *prima facie* case of racial discrimination because Cardinal was not qualified under the contract specifications. This appears to be correct. Both the original and second specifications required the bidding companies to have access to a class eight wrecker and to guarantee service within fifteen minutes. Nothing in the specifications indicates that class eight wrecker service was exempted from the fifteen-minute requirement. While Cardinal's arrangement with Beard's provided it with access to a large wrecker, the letter from Beard's attached to Cardinal's submission was very clear in claiming that service would take, on average, forty-five minutes to an hour. Thus Cardinal could not guarantee service within fifteen minutes and was not qualified under the original specifications.[7] The additional requirements added when

---

[7] Cardinal highlights the fact that it promised to obtain a wrecker soon after the contract was awarded. However, the fact that Cardinal felt it necessary to include Beard's availability in its submission reflects that the City would have been exposed to substandard service for a period of time. And the City was not required to accept Cardinal's general promise of future compliance. *See Davis*, 14 F.3d at 1087 (applicant for heavy labor position was not qualified due to serious knee injury, despite his claim that injury would heal within a few months). Had Cardinal explained that it had actually made firm arrangements to purchase the wrecker as soon as the contract was awarded, and enclosed agreements or other documentation showing that the sale could proceed immediately, a materially different situation might be presented. However, the bid proposals in the record do not contain any such specifics or any supporting documentation in that regard (although full documentation on other vehicles is included).

the contract was rebid merely reinforced the fact that Cardinal was unqualified. They required computerized records and an office located at the storage facility, and while Cardinal promised to fulfill these conditions, it did not meet either at the time it submitted its bid. The second bidding also required ownership of a class eight wrecker, which made Cardinal's reliance on Beard's as a stopgap insufficient.

The district court focused on Cardinal's failure to meet the qualifications of the second bid. Under those terms, Cardinal did not qualify and thus no *prima facie* case was established. Cardinal argues that this focus is in error, claiming that its failure to qualify was caused by the City's purposeful tailoring of the specifications for the second bid to exclude it. It attempts to paint the City's actions here as similar to the manipulation of voting requirements after African-Americans received the franchise, or a scenario the Supreme Court has mentioned in which a City rezones property to prevent the development of housing for African-Americans. *See Village of Arlington Heights v. Metro Housing*, 97 S.Ct. 555, 564 (1977).

But those examples are readily distinguishable. In both, African-Americans would have been entitled to what they sought but for the government's alteration of the standard. Under those circumstances, and when the change is clearly tied to the arrival of minority claimants on the scene, an inference that the change is

motivated by discrimination is easily drawn.  And application of a standard that may have been motivated by racial animus cannot shield a government entity from a discrimination claim.  Here, in contrast, Cardinal was not qualified under the original specifications, which were drawn up before the City was aware of Matoke's race (or of that of the owner(s) of B&B).  Whatever spurred the change, it surely could not have been racial animus, since the City could have satisfied any urge to exclude Matoke under the original rules.  Accordingly, application of the second bid standards is proper, and since Cardinal did not qualify under that standard no *prima facie* case was created.  The district court thus properly dismissed Cardinal's racial discrimination claims.

## Conclusion

The district court's judgment is accordingly

AFFIRMED.

27