OPINION OF THE COURT
John M. Curran, J.
Plaintiff relators Kevin Grupp and Robert Moll (plaintiffs) sue under the New York False Claims Act (SFCA), a statute enacted in 2007 and the subject of little case law to date (State Finance Law § 187 et seq.). Under that statute, a person who knowingly submits a false or fraudulent claim for payment to the State may be held liable for fines, treble damages, and attorneys’ fees (State Finance Law § 189 [1], [3]). Actions may be brought by the State Attorney General or by “whistleblowers,” such as plaintiffs. Plaintiffs allege that defendants DHL Express (USA), Inc., DHL Worldwide Express, Inc, and DPWN Holdings (USA), Inc., formerly known as DHL Holdings (USA), Inc. (hereinafter referred to as DHL)[1] submitted false claims under a state contract by charging improper fuel surcharges for package delivery. In lieu of answering, DHL moved to dismiss the amended complaint pursuant to CPLR 3211 (a) (1) and (7).
After the motion was argued, the court requested further briefing on the following question:
“(1) Whether the ‘market participant’ or ‘market proprietor’ exception to federal pre-emption should apply with respect to the effect of the Airline Deregulation Act of 1978 (49 USC § 41713) and the Federal Aviation Administration Authorization Act (49 USC § 14501) on the New York State False Claims act claims in this matter? (see e.g. Cardinal Towing & Auto Repair, Inc. v City of Bedford, Tex., 180 F3d 686, 694-697 [5th Cir 1999]; see also Healthcare Ass’n of New York State, Inc. v Pataki, 471 F3d 87, 108-109 [2nd Cir 2006]).” (Letter to counsel, Oct. 13, 2009.)
Simultaneous submissions were received November 9, 2009, with replies received November 23, 2009, after which the motion was again taken under submission. Upon due consideration, the court denies the motion in its entirety.
*976 Background
Plaintiffs are the owners of MVP Delivery and Logistics, Inc. (MVP), an independent trucking company. MVP contracted to provide package pick-up and delivery services for DHL in the Buffalo area (amended complaint HH 7, 20, Coll affirmation, exhibit 1). With respect to certain package deliveries, the amended complaint asserts that DHL submitted false claims to the State, including the Department of Transportation, the Thruway Authority and various universities and hospitals as well as various local governments, for the purpose of obtaining payments in excess of those to which they were entitled (amended complaint HI).
In December 2001, DHL’s predecessor-in-interest, Airborne Express, was awarded a contract through the State Office of General Services to provide courier services (amended complaint H 47, Coll affirmation, exhibit 3). The contract was amended numerous times, and extended through 2008 (amended complaint H 28, Coll affirmation, exhibits 4, 5). Under that contract, DHL offered several categories of shipping services. “Ground Delivery Service” offered delivery within the state within three business days and within the contiguous United States within five days (Coll affirmation, exhibit 4, at 3, 17-19). “Overnight Air Express” offered delivery by noon (or 10:30 a.m. for an extra $.50) on the next business day to most points in the United States (id. at 8-10). “Next Afternoon Service” offered delivery by 3:00 p.m. on the next business day to most points in the United States (id. at 11-13). “Second Day Service” offered delivery by 5:00 p.m. on the second business day to most points in the United States (id. at 14-16). Both “Next Afternoon Service” and “Second Day Service” were also known as “Air Express Services” (DHL’s mem of law at 2, citing Coll affirmation, exhibit 4, at 8-16).
The contract permitted the assessment of a fuel surcharge, and at least in the version in the record, with an 8% cap (Coll affirmation, exhibit 4, at 20). The version of the contract appearing in the record states:
“Domestic Air. Express shipments are assessed a fuel surcharge with an 8% cap. Ground shipments are assessed a variable fuel surcharge not to exceed the 8% cap. Ground Shipments are assessed a fuel surcharge which is indexed to the US Dept, of Energy’s on-highway diesel fuel index. Contract users can find updated fuel charge information on *977 http://www.dhl-usa.com/home/home.asp” (Coll affirmation, exhibit 4, at 20).
Plaintiffs assert that DHL misrepresented that next day and second day packages would travel by air, when, in fact, they were delivered solely through ground transportation. Plaintiffs also allege that DHL represented to state and local governments that it needed to impose, and began imposing, jet fuel surcharges for packages for next day and second day deliveries, regardless of whether the items were transported by air during any portion of the delivery. In addition, plaintiffs allege that DHL imposed diesel fuel surcharges on ground delivery shipments, while passing along only a small portion of those surcharges to the independent contract truckers who bought the fuel (amended complaint 1ÍU 24-38).
DHL asserts that the fuel surcharge rates applied without regard to the manner in which the packages traveled, because “[t]he terms of DHL Express’s Air Express Ground Delivery Service waybills reserve to DHL Express the option to transport a package ‘by any means DHL chooses, including air, road or any other carrier’ ” (DHL’s mem of law at 4, quoting Coll affirmation, exhibits 10, 11).
Procedural History
Pursuant to statute and regulations, plaintiffs filed their qui tarn action and served it upon the State Attorney General (State Finance Law § 190 [2] [a], [b]; 13 NYCRR 400.4). After the Attorney General declined to intervene (Coll affirmation, exhibit 12) , plaintiffs determined to continue the action (id., exhibit 13) . The amended complaint was served upon DHL in or about March 2009. Count I alleges violations of State Finance Law § 189 (1) (a) and (b), providing that any person who knowingly presents or causes to be presented a false or fraudulent claim for payment ([1] [a]), and anyone who knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved ([1] [b]) by the state or local government, may be liable for a civil penalty of between $6,000 and $12,000 for each such claim,[2] plus three times the amount of damages sustained (see State Finance Law § 189 [1] [a], [b], [g]). Count II alleges that DHL and its employees knowingly conspired among themselves and with others, including their agents, to submit false and fraudulent claims to the State *978 (State Finance Law § 189 [1] [c]). Plaintiffs allege that they are the “original source” of the allegations against DHL, within the meaning of State Finance Law § 188 (5) (amended complaint 1Í9).[3]
Motion to Dismiss
“Under modern pleading theory, a complaint should not be dismissed on a pleading motion so long as, when the plaintiff is given the benefit of every possible favorable inference, a cause of action exists
“Modern pleading rules are designed to focus attention on whether the pleader has a cause of action rather than on whether he has properly stated one” (Rovello v Orofino Realty Co., 40 NY2d 633, 634, 636 [1976] [citation omitted]).
“On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction. We accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory” (Leon v Martinez, 84 NY2d 83, 87-88 [1994] [citation omitted]).
Discussion
DHL’s primary argument is that the Airline Deregulation Act (ADA) (49 USC § 41713) and the Federal Aviation Administration Authorization Act (FAAAA) (49 USC § 14501 [c] [Pub L 103-305, § 601 (c), 108 US Stat 1569, 1606, as amended by ICC Termination Act of 1995, Pub L 104-88, § 103, 109 US Stat 803, 899]) preempt this suit. The ADA was enacted in 1978 after Congress “determin[ed] that ‘maximum reliance on competitive market forces’ would best further ‘efficiency, innovation, and low prices’ as well as ‘variety [and] quality . . . of air transportation services’ ” (Morales v Trans World Airlines, Inc., 504 US 374, 378 [1992]). The ADA includes a preemption provision that provides in pertinent part:
“(b) Preemption. — (1) Except as provided in this *979 subsection, a State . . . may not enact or enforce a law . . . related to a price, route, or service of an air carrier that may provide air transportation under this subpart. . .
“(3) This subsection does not limit a State, political subdivision of a State, . . . that owns or operates an airport served by an air carrier holding a certificate issued by the Secretary of Transportation from carrying out its proprietary powers and rights.” (49 USC § 41713 [b] [1], [3] [emphasis supplied]; see § 41713 [b] [4].)[4]
The FAAAA provides, in section 14501 entitled “Federal authority over intrastate transportation”:
“(c) Motor carriers of property.—
“(1) General rule. — Except as provided in paragraphs (2) and (3), a State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713 (b) (4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.” (49 USC § 14501 [c] [1] [emphasis supplied].)
These provisions of the ADA and FAAAA are “intended to function in the exact same manner with respect to [their] preemptive effects” (HR Rep 677, 103rd Cong, 2d Sess, at 85, reprinted in 1994 US Code Cong & Admin News, at 1715, 1757).[5]
The Court of Appeals for the Fifth Circuit succinctly summarized the basic principles of federal preemption:
“The doctrine ... is rooted in the Supremacy *980 Clause of the United States Constitution, which provides that ‘the Laws of the United States . . . shall be the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. ’ U.S. Const, art. VI, cl. 2. ‘As a consequence, state and local laws are preempted where they conflict with the dictates of federal law, and must yield to those dictates.’ Ace Auto Body & Towing, Ltd. v. City of New York, 171 F.3d 765, 771 (2d Cir. 1999) . . .
“Federal law preempts state and local laws whenever (1) Congress has expressly preempted state action; (2) Congress has devised a comprehensive regulatory scheme in the area, thus ‘removing the entire field from the state realm’; or (3) state action directly conflicts with the ‘force or purpose’ of federal law. Thus, ‘[preemption may be either express or implied, and is compelled whether Congress’ command is explicitly stated in the statute’s language or implicitly contained in its structure and purpose’ ” (Stucky v City of San Antonio, 260 F3d 424, 430-431 [5th Cir 2001] [citations and internal quotation marks omitted], judgment vacated on other grounds 536 US 936 [2002], on remand 307 F3d 315 [5th Cir 2002]).
Finally, Congress’ intent “is the ultimate touchstone of preemption analysis” (Cipollone v Liggett Group, Inc., 505 US 504, 516 [1992] [citations and internal quotation marks omitted]).
The analysis begins, therefore, with the language of the express preemption provisions. The United States Supreme Court defined the “relating to” language in the ADA preemption clause as “having a connection with, or reference to, airline ‘rates, routes, or services’ ” (Morales v Trans World Airlines, Inc., 504 US 374, 384 [1992]).[6] As Justice Scalia stated in Morales, “[s]ince the relevant language of the ADA is identical” to the language of the preemption clause in the Employee Retirement Income Security Act (ERISA) (29 USC § 1144 [a]), “we think it appropriate to adopt the same standard here: State enforcement actions having a connection with, or reference to, airline ‘rates, routes, or services’ are pre-empted” under the ADA (Morales, 504 US at 384). Further, the Court looks to *981 whether the state law has “the forbidden significant effect” upon rates, routes or services (Morales, 504 US at 388).
In American Airlines, Inc. v Wolens (513 US 219, 223 [1995]), the Supreme Court determined that the ADA’s preemption provision bars “state-imposed regulation of air carriers, but allows room for [state] court enforcement of contract terms set by the parties themselves” (Wolens, 513 US at 222). In that case, enrollees in American Airlines’ frequent flier mileage programs challenged retroactive changes to the credits they had earned, under the Illinois Consumer Fraud and Deceptive Business Practices Act and as a breach of contract. The Supreme Court concluded that “the ADA permits state-law-based court adjudication of routine breach-of-contract claims” {id. at 232).
“Th[is] conclusion . . . also makes sense of Congress’ retention of the FAA’s saving clause, § 1106, 49 U.S.C. App. § 1506 (preserving ‘the remedies now existing at common law or by statute’). The ADA’s preemption clause, . . . read together with the FAA’s saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach-of-contract actions, to the parties’ bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.” {American Airlines, Inc. v Wolens, 513 US at 232-233 [footnote omitted and emphasis supplied].)
Finally, the Court’s interpretation of the breadth of the ADA/ FAAAA’s preemption provisions nonetheless “left room for state actions ‘too tenuous, remote, or peripheral ... to have’ ” the undesirable effect on airline/motor carrier routes, rates or services (Wolens, 513 US at 224, quoting Morales, 504 US at 390 [internal quotation marks omitted]).
In the instant action, the parties agree on one point: there is no case law in this state concerning whether the SFCA under any circumstances would be preempted by the ADA or the FAAAA, or even by ERISA;[7] in fact, there is virtually no case law under the SFCA. Thus, the court is faced with a matter of first impression.
*982 The language of the ADA and FAAAA establishes that, by-allowing this suit to continue, the court would be enforcing a state law in such a way as to “relate to” airline and motor carrier rates, or, to use Justice Scalia’s phraseology in Morales, enforcing a state law which has “a connection with or reference to” airline and motor carrier rates (Morales, 504 US at 384). In addition, actions brought under the SFCA, at least when (as here) the Attorney General declines to participate, cannot be characterized as routine breach of contract actions (Wolens, 513 US at 232), which are not preempted under the case law. No routine breach of contract action could be brought by a so-called whistleblower, lacking privity, who pursuant solely to state law becomes entitled to a portion of the recovery. Therefore, the SFCA causes of action here are expressly preempted by the ADA and the FAAAA., unless there is an applicable exception.
Upon request of the court, the parties briefed the issue whether the SFCA constitutes a species of proprietary state action, traditionally an exception to federal preemption (see e.g. Cardinal Towing & Auto Repair, Inc. v City of Bedford, Tex., 180 F3d 686, 690-697 [1999] [applying state as market participant exception to federal preemption under FAAAA]; Stucky v City of San Antonio, 260 F3d 424, 432-436 [2001] [market participant exception did not apply], judgment vacated on other grounds 536 US 936 [2002]; see also Healthcare Assn. of N.Y. State, Inc. v Pataki, 471 F3d 87, 108-109 [2006] [discussing application of state as market participant exception under labor law]). The court sought the parties’ guidance and briefing on the issue for several reasons. First, the states have been strongly encouraged by the federal government under Medicaid law to enact state versions of the Federal False Claims Act (31 USC § 3729 et seq.; see 42 USC § 1396h [a] [if state has in effect law relating to false claims meeting certain requirements, the federal Medicaid percentage of recoveries under such law will be decreased by 10%]). Second, the Federal False Claims Act, originally enacted under the Lincoln administration, has, after recent amendments, resulted in the collection of billions of dollars in. monies fraudulently converted from federal taxpayers (see Loewenson & Smithline, Outside Counsel, New York’s New False Claims Act, NYLJ, Apr. 23, 2007, at 4, col 4). Thus, the contention that a statute potentially as valuable to state taxpayers as the SFCA can be nullified in any case “related to” airline or motor carrier rates, routes, or services must be closely studied. “Given the volume of, and obvious need for, interaction be *983 tween the government and the private sector, the application of preemption in a manner that hobbles state and local governments’ purchasing efforts threatens severe disruption” (Cardinal Towing & Auto Repair Inc. v City of Bedford, Tex., 180 F3d at 692).
In Cardinal Towing, the Fifth Circuit considered whether a city ordinance providing that only one towing company would be awarded the contract for nonconsensual towing required by the city was preempted by the FAAAA (id. at 690). The court stated that, as found by the United States Supreme Court, “when a state or municipality acts as a participant in the market and does so in a narrow and focused manner consistent with the behavior of other market participants, such action does not constitute regulation subject to preemption” (Cardinal Towing, 180 F3d at 691, citing Building & Constr. Trades Council v Associated Builders & Contractors of Mass./R. I., Inc., 507 US 218, 227-228 [1993]). The Fifth Circuit held that the City of Bedford’s actions “were proprietary and did not constitute the type of regulation covered in the statute’s preemption clause” (Cardinal Towing, 180 F3d at 690).
Likewise, in Building & Constr. Trades, the United States Supreme Court stated:
“When a State owns and manages property ... it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the [National Labor Relations Act (29 USC § 151 et seq.)], because pre-emption doctrines apply only to state regulation” (Building & Constr. Trades, 507 US at 227).
The Fifth Circuit interpreted the Supreme Court’s test for the application of the proprietary or “market participant” exception to federal preemption as follows:
“In distinguishing between proprietary action that is immune from pre-emption and impermissible attempts to regulate through the spending power, the key under [Building & Constr. Trades] is to focus on two questions. First, does the challenged action essentially reflect the entity’s own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances ? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific pro *984 prietary problem ? Both questions seek to isolate a class of government interactions with the market that are so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out.” (Cardinal Towing & Auto Repair, Inc. v City of Bedford, Tex., 180 F3d at 693 [emphasis supplied], citing Building & Constr. Trades Council, 507 US 218 [1993]; see generally Matter of Council of City of N.Y. v Bloomberg, 6 NY3d 380, 395 [2006].)
The answers to both of these questions point to the conclusion that the SFCA, as applied in this case, represents proprietary action immune from preemption. The overcharging of the State for goods and services provided by private companies is the prime ill that the SFCA seeks to address — which is, for the State, a “specific proprietary problem” (Cardinal Towing, 180 F3d at 693). But because the State is such a major consumer of goods and services, the SFCA permits relators such as plaintiffs to bring to its attention and, taking the risk of nonrecovery, prosecute the State’s claims against providers of false statements.
“[W]hen a state acts in a proprietary fashion and contracts as a private party would, ‘it does not “regulate” the workings of the market forces that Congress expected to find; it exemplifies them’ ” (Cardinal Towing & Auto Repair, Inc., 180 F3d at 695, quoting Building & Constr. Trades Council, 507 US at 233 [citations omitted]). In Ward v State of New York (291 F Supp 2d 188 [WD NY 2003]), Judge Skretny considered whether the FAAAA preempted a state law barring the shipping of cigarettes directly to consumers.
“The FAAAA’s preemption provision was designed to override state economic regulation of interstate carriers. In the present case, the Statute is manifestly not an attempt by the State to impose economic regulations on carriers. Rather, the Statute is designed to combat ‘the pernicious effects of cigarette smoking’ by reducing adult consumption and restricting minors’ access to cigarettes. Indeed, the Statute is not even limited to carriers. It also restricts the ability of ‘any other person’ to knowingly transport cigarettes. In this regard, the Statute is like numerous other New York State laws that prohibit the knowing transportation and distribution of regulated items. These types of laws and *985 regulations ‘relate to ’ the business of carriers, but are not preempted by the FAAAA because Congress intended ‘to leave the states’ residual control over safety and other local concerns intact.’ ” (Ward, 291 F Supp 2d at 209-210 [emphasis supplied; citations omitted].)
Likewise, in this case, the SFCA is not limited to airline and motor carriers, but applies to any person who attempts to defraud the State, and is like other state statutes that forbid fraudulent claims against the State (Social Services Law § 366-b [criminal penalties for false claims submitted by Medicaid providers]; id. § 145-b [civil penalties for false “statements” made by Medicaid providers]; Penal Law § 175.35 [offering a false instrument for filing in the first degree with intent to defraud the State or any political subdivision]; Penal Law § 195.20 [felony of defrauding the government]).
Finally, plaintiffs contend that, because the SFCA is a quasi-criminal exercise of the state’s police power — to protect state coffers from looting — federal preemption carries less weight. As the United States Supreme Court stated:
“Indeed, in cases like this one [under ERISA], where federal law is said to bar state action in fields of traditional state regulation, we have worked on the ‘assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress’ ” (New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co., 514 US 645, 655 [1995] [citations omitted]).
DHL has not shown that it was the clear and manifest purpose of Congress to preempt whistleblower actions, such as this one, in order to encourage market competition. In fact, the idea is counterintuitive. For all of the above reasons, the court determines that this action is not preempted by federal law.
Failure to State a Claim
DHL also contends that it was contractually permitted to impose the fuel surcharges it charged to the State based upon the express terms of the contract, and that therefore no false claims were submitted to the State. Specifically, DHL asserts that the contract permitted it to impose a fuel surcharge at “air shipment” rates for all next day and second day deliveries, regardless of whether they went by air. Thus, DHL contends that jet fuel surcharges could be charged for specific “service *986 types” — i.e., faster service — regardless of whether the packages were delivered by air. Further, DHL contends that its contract permitted it to impose a diesel fuel surcharge at ground shipment rates for all ground delivery service shipments, whether or not they were paying more to their subcontractors — such as plaintiffs — who were actually paying the fuel costs. Thus, DHL asserts, none of its charges under the contract was fraudulent or false as alleged.
The contract provides that “[t]he fuel surcharge percentage rate is subject to a monthly adjustment which may not exceed at any time the published rate or 8% for ground or air, whichever is lower” and that surcharge information was “available on the contractors’ website” (Coll affirmation, exhibit 5, at 1). The indexed fuel surcharge table for 2008 appears in DHL’s exhibit 7. That document states:

“Air Express . . .

“The Air Express . . . indexed surcharge calculation is linked to the monthly rounded average of the U.S. Gulf Coast (USGC) price for a gallon of kerosene-type jet fuel as published by the U.S. Department of Energy. . . .

“Ground Delivery Service Fuel Surcharge

“The Ground Delivery Service indexed surcharge calculation is linked to the monthly rounded average of the national U.S. On-Highway average price for a gallon of diesel fuel as published by the U.S. Department of Energy.” (Coll affirmation, exhibit 7.)
Plaintiffs essentially argue that DHL’s application of the contractual language would cause an unreasonable result, i.e., that the State agreed to a contract authorizing a higher jet fuel surcharge on packages traveling by ground. DHL’s construction of the contract, at least at this prediscovery juncture, cannot be accepted because it would lead to an absurd or at least unsound result (Lee v Marvel Enters., Inc., 386 F Supp 2d 235, 244 [SD NY 2005]; Medical Self Care, Inc. v National Broadcasting Co., Inc., 2003 WL 1622181, *4, 2003 US Dist LEXIS 4666, *10 [SD NY 2003]; Natwest USA Credit Corp. v Alco Std. Corp., 858 F Supp 401, 403 [SD NY 1994]). A contract should not be construed to give one party an unfair or unreasonable advantage over another (Metropolitan Life Ins. Co. v Noble Lowndes Intl., 84 NY2d 430, 438 [1994], reh denied 84 NY2d 1008 [1994]). Insofar as DHL seeks dismissal of the complaint on this basis, its motion is denied.
*987 CPLR 3016 (b) — Pleading Fraud in Detail
DHL contends that the complaint lacks the required detail under CPLR 3016 (b) with respect to the “who,” “what,” “when” and “where” of the allegedly fraudulent billing. DHL is correct that CPLR 3016 (b) applies also to statutory fraud causes of action (Cuglietto v Ferone, 269 AD2d 556 [2d Dept 2000]). Under that subdivision, relating specifically to the pleading of fraud causes of action: “Where a cause of action ... is based upon misrepresentation [or] fraud, . . . the circumstances constituting the wrong shall be stated in detail” (CPLR 3016 [b]). Although as stated by DHL, federal courts require particularity in pleading actions under the Federal False Claims Act (see e.g. Gold v Morrison-Knudsen Co., 68 F3d 1475, 1477 [2d Cir 1995], cert denied 517 US 1213 [1996]), federal pleading standards under Federal Rules of Civil Procedure rule 9 (b) are more strict than under the CPLR (see Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, CPLR C3016:3; Jered Contr. Corp. v New York City Tr. Auth., 22 NY2d 187, 194 [1968] [“It is almost impossible to state in detail the circumstances constituting a fraud where those circumstances are peculiarly within the knowledge” of the opposing party]).
Critical to a fraud claim is that a complaint allege the basic facts to establish the elements of the cause of action. Although under section 3016 (b) the complaint must sufficiently detail the allegedly fraudulent conduct, that requirement should not be confused with unassailable proof of fraud. Necessarily, then, section 3016 (b) may be met when the facts are sufficient to permit a reasonable inference of the alleged conduct (Pludeman v Northern Leasing Sys., Inc., 10 NY3d 486, 492 [2008]). The complaint in this instance has sufficiently laid out the alleged fraud at issue, and plaintiffs need not specify in the complaint every particular of each package to which an allegedly improper surcharge was added to sustain the complaint at this pleading stage. This contention is without merit.
Statute of Limitations
DHL next contends that, pursuant to the ICC Termination Act of 1995, a shipper must contest an invoice within 180 days of receipt in order to sue to recover for alleged overbilling (see 49 USC § 13710 [a] [3]). That provision states:
“(3) Billing disputes.—
“(A) Initiated by motor carriers. — In those cases *988 where a motor carrier (other than a motor carrier providing transportation of household goods or in noncontiguous domestic trade) seeks to collect charges in addition to those billed and collected which are contested by the payor, the carrier may request that the Board determine whether any additional charges over those billed and collected must be paid. A carrier must issue any bill for charges in addition to those originally billed within 180 days of the receipt of the original bill in order to have the right to collect such charges.
“(B) Initiated by shippers. — If a shipper seeks to contest the charges originally billed or additional charges subsequently billed, the shipper may request that the Board determine whether the charges billed must be paid. A shipper must contest the original bill or subsequent bill within 180 days of receipt of the bill in order to have the right to contest such charges.” (49 USC § 13710 [a] [3] [A], [B] [emphasis supplied].)
The Board at issue is now the Surface Transportation Board. These provisions create at most concurrent jurisdiction in the Board over such billing disputes; there is no evidence that they preempt state law provisions on jurisdiction or statute of limitations (see e.g. 49 USC § 13103 [“Except as otherwise provided in this part, the remedies provided under this part are in addition to remedies existing under another law or common law”]; see also 49 USC § 13501 [Surface Transportation Board has no jurisdiction over intrastate motor carrier transportation]).
DHL also contends that the statute of limitations found in the Interstate Commerce Act (ICA) at 49 USC § 14705 (b) bars recovery to plaintiffs on any claim arising 18 months or more prior to the filing of the complaint. That section provides in part:
“A person must begin a civil action to recover overcharges within 18 months after the claim accrues. If the claim is against a carrier providing transportation subject to jurisdiction under chapter 135 and an election to file a complaint with the Board or Secretary, as applicable, is made under section 14704 (c) (1), the complaint must be filed within 3 years after the claim accrues.” (49 USC § 14705 [b].)
There is a split of decision in the federal case law whether this *989 statute applies to state law claims (compare Barber Auto Sales, Inc. v United Parcel Servs., Inc., 494 F Supp 2d 1290, 1294-1295 [ND Ala 2007] [18-month statute under ICA applies to state law claims], with Learning Links, Inc. v United Parcel Serv. of Am., Inc., 2006 WL 785274, 2006 US Dist LEXIS 13574 [SD NY 2006], reconsideration denied 2006 WL 2466252, 2006 US Dist LEXIS 60542 [SD NY 2006] [49 USC § 14705 (b) applies only to claims asserted under the Carmack Amendment (49 USC § 14706)]). This court determines that the United States District Court for the Southern District of New York has properly analyzed the issue. That court determined that 49 USC § 14705 (b) applies only to claims based upon a carrier’s having charged more than its published tariff rates (49 USC § 14706), not to claims of overcharging with respect to privately agreed upon terms (Learning Links, 2006 WL 785274, *5, 2006 US Dist LEXIS 13574, *14-15). In any event, plaintiffs assert that they seek recovery for false claims only from the inception of the SFCA, less than 18 months prior to service of the complaint. Thus, they assert that the case is timely even under the federal statute. Therefore, upon due consideration, the court denies the motion to dismiss in its entirety.
Plaintiffs to settle order with defendants, and upon entry of the order, the case will be transferred to Justice Michalek, the new Commercial Division justice in the Eighth Judicial District, for further proceedings.

. DHL Express is an air carrier and a registered motor carrier (Coll affirmation H 3, exhibit 2). DHL Worldwide Express, Inc. is a former name of DHL Express. DPWN Holdings (USA), Inc. is a holding company that is the parent company of DHL Express (DHL mem of law at 2).

. Local governments may not collect civil penalties, only treble damages (State Finance Law § 189 [1] [g]).

. Under the SFCA, “Original source” means “a person who has direct and independent knowledge of the information on which allegations are based, and has voluntarily provided the information to the state or a local government before filing an action under this article which is based on the information” (State Finance Law § 188 [5]).

. Subsection (b) (4) of section 41713 provides similarly with respect to combined motor/air carriers (see Rowe v New Hampshire Motor Transp. Assn., 552 US 364, 368 [2008]). It provides in part:
“(4) Transportation by air carrier or carrier affiliated with a direct air carrier.—
“(A) General rule. — Except as provided in subparagraph (B), a State . . . may not enact or enforce a law . . . related to a price, route, or service of an air carrier or carrier affiliated with a direct air carrier through common controlling ownership when such carrier is transporting property by aircraft or by motor vehicle (whether or not such property has had or will have a prior or subsequent air movement).” (Emphasis supplied.)

. “[B]y enacting a preemption provision identical to an existing provision deregulating air carriers (the [ADA]), Congress sought to ‘even the playing field’ between air carriers and motor carriers” (Californians for Safe & Competitive Dump Truck Transp. v Mendonca, 152 F3d 1184, 1187 [9th Cir 1998], cert denied 526 US 1060 [1999]).

. The ADA preemption provision was recodified after having been interpreted by Morales but was substantively unchanged (American Airlines, Inc. v Wolens, 513 US 219, 223 n 1 [1995]).

. See plaintiffs’ mem of law at 10; DHL mem of law at 4 n 2.