Dear Representative Morgan,
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:
 Is 6 O.S. 2001, § 427, which prohibits banks from serving as trustees of bond issues of public bodies in Oklahoma unless such banks maintain a trust office staffed by a trust officer in Oklahoma, preempted by Section 92a of the National Bank Act, insofar as it affects national banks doing business in Oklahoma?
¶ 1 Title 6 O.S. 2001, § 427[6-427] provides:
 Any bank or trust institution serving as a trustee of a bond issue of a public body in Oklahoma shall have and maintain a representative trust office within this state and shall have a trust officer in such office.
Id.
¶ 2 You ask whether this statute is preempted by the National Bank Act, 12 U.S.C. § 92a, under current interpretation of the Office of the Comptroller of the Currency ("OCC"),[1]
insofar as it relates to a national bank serving as bond trustee for a bond issue of a public body in Oklahoma. In other words, can the Oklahoma statute effectively prohibit a public body from employing, as a trustee on a bond issue, a national bank having no trust office or trust officer in the State?
 I. Introduction
¶ 3 The National Bank Act, 12 U.S.C. §§ 21-216d, generally covers the creation and operation of banks chartered under Federal law. Section 92a of the National Bank Act provides, in pertinent part:
(a) Authority of Comptroller of the Currency
 The Comptroller of the Currency shall be authorized and empowered to grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.
 (b) Grant and exercise of powers deemed not in contravention of State or local law
 Whenever the laws of such State authorize or permit the exercise of any or all of the foregoing powers by State banks, trust companies, or other corporations which compete with national banks, the granting to and the exercise of such powers by national banks shall not be deemed to be in contravention of State or local law within the meaning of this section.
Id. (emphasis added).
¶ 4 "National banks are brought into existence under federal legislation, are instrumentalities of the federal government and are necessarily subject to the paramount authority of the United States. Nevertheless, national banks are subject to the laws of a state in respect of their affairs, unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies, or conflict with the paramount law of the United States." First Nat'l Bank v.Missouri, 263 U.S. 640, 656 (1924). See also Anderson Nat'lBank v. Luckett, 321 U.S. 233, 246 (1944) (holding that a state "statute infringes the national banking laws and unconstitutionally interferes with appellant as an instrumentality of the federal government. But the statute does not discriminate against national banks, by directing payment to the state by state and national banks alike, of presumptively abandoned accounts. Nor do we find any word in the national banking laws which expressly or by implication conflicts with the provisions of the [state] statutes.") (citation omitted).
¶ 5 Regarding the preemptive effect of the National Bank Act, the Supreme Court has observed that the "question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state law." Barnett Bank v. Nelson, 517 U.S. 25, 30 (1996). "In defining the pre-emptive scope of statutes and regulations granting a power to national banks, these cases take the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." Id. at 33. Barnett Bank cited 19 U.S.C. § 92a(a) as one of the "federal banking statutes that accompany a grant of an explicit power with an explicit statement that the exercise of that power is subject to state law" that the "Court has interpreted . . . to mean what they say." Id. at 34. However, the Supreme Court also made clear that with respect to federal preemption of state laws implicating state sovereignty, if Congress intends to "upset the usual constitutional balance of federal and state powers[,] . . . it must make its intention to do so `unmistakably clear in the language of the statute.'"Gregory v. Ashcroft, 501 U.S. 452, 460-61 (1991) (quotingAtascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985)).
¶ 6 The OCC is the "administrator charged with supervision of the National Bank Act." NationsBank v. Variable Annuity LifeIns. Co., 513 U.S. 251, 256 (1995). The OCC's interpretations deserve deference "with respect to his deliberative conclusions as to the meaning of these laws." Id. at 256-57 (citation omitted). In the OCC's Interpretive Letter No. 866,[2] ("IL 866"), it was determined that Section 92a preempted all laws that purported to prohibit a bank from engaging in fiduciary activities, other than those laws of the state where it performed core fiduciary functions.[3] The OCC expressly included laws imposing conditions such as licensing or approval by the state, or having a trust office in the state, among those preempted by Section 92a.[4] The OCC included the interpretation from IL 866 in its regulations at 12 C.F.R § 9.7
(2001).
¶ 7 Oklahoma's statute, 6 O.S. 2001, § 427[6-427], imposes a condition of having a trust office in the state on national banks that serve as trustees on bond issues of public bodies. As explained below, Section 427 would have been preempted by the National Bank Act, in accordance with the opinion of the OCC, had Section 427 purported to prevent national banks from serving in a fiduciary capacity for private parties. However, Section 427, though phrased as a prohibition on banks or trust institutions, has the primary effect and purpose of restricting public bodies in the State of Oklahoma by prohibiting those public bodies from employing as trustees of bond issues, banks or trust institutions which do not maintain a trust office staffed with a trust officer in the State.
¶ 8 Oklahoma's statute involves the relationship between the State and its agencies which exercise governmental powers the State has entrusted to those agencies, and thus implicates Oklahoma's sovereignty as a state. The OCC's interpretive letter and the case law cited therein do not deal with state laws that implicate state sovereignty. Gregory held that Congress must make clear its intention to preempt state laws implicating state sovereignty. Gregory, 501 U.S. at 460-61. Thus, it must be determined in what way Gregory limits the preemptive effect of the National Bank Act, as interpreted by the OCC, on 6 O.S. 2001, § 427[6-427].
 II. State Laws Preempted Under Interpretive Letter No. 866
¶ 9 In IL 866 at page 5, the OCC explained that "section 92a(a) authorizes a national bank to act in fiduciary capacities, with the extent of permissible capacities being determined in part by the laws of the state where the bank is located." Id. The OCC determined that throughout Section 92a, the references to state laws "occur in conjunction with references to, or descriptions of, the national bank's acting in a fiduciary capacity." Id.
The OCC thus concluded that "for purposes of section 92a a national bank is `located' in a state where it acts in a fiduciary capacity." Id. at 5-6. The OCC noted that the statute does not explicitly address the level of contact necessary for a bank to be considered as acting in a fiduciary capacity, but offered its view of "the best construction of the statute" which was "to determine that location by looking to the place at which the bank performs core functions of a fiduciary." Id. at 6 (emphasis added). This determination was explained thus:
 These core functions include accepting the appointment, executing the documents that create the fiduciary relationship, and making decisions regarding the investment or distribution of fiduciary assets.
 Conversely, the determination of where the bank acts in a fiduciary capacity should not look to every location where customers reside or where trust assets are located, or be based on places at which the bank engages in other non-fiduciary activities primarily for the purpose of establishing or maintaining customer relationships. Thus, core fiduciary functions do not include advertising, marketing, or soliciting for fiduciary business; contacting existing or potential customers, answering questions, and providing information about matters related to their accounts; acting as a liaison between the trust office and the customer (e.g., forwarding requests for distribution or changes in investment objectives, or forwarding forms and funds received from the customer); or simply inspecting or maintaining custody of fiduciary assets.
Id. (footnote omitted).
¶ 10 The OCC concluded that once a bank is authorized under Section 92a to act in a fiduciary capacity, Section 92a imposes no limitations on where the bank may market its services or where the bank's fiduciary customers may be located. According to the OCC:
 [T]he fiduciary capacities in which a national bank may act . . . are determined by reference to the law of the state in which the bank acts in a fiduciary capacity, but the bank may advertise and solicit customers for its fiduciary business from other states. The bank also may operate trust representative offices nationwide, where it does not perform fiduciary activities, to facilitate performance of its fiduciary business.
Id. at 8. The OCC concluded that Section 92a preempted all laws that purported to prohibit a bank from engaging in fiduciary activities, other than those laws of the state where it performed core fiduciary functions. Id. at 6. The OCC expressly included among those laws preempted by Section 92a laws which impose conditions such as licensing or approval by the state or having a trust office in the state. Id. at 9-10. However, the OCC's opinion did not address state statutes that regulate political subdivisions or other public bodies of those states, as does 6O.S. 2001, § 427[6-427], by prohibiting public bodies from using entities lacking an in-state trust office and trust officer as trustees of bond issues by those public bodies. See IL 866.
 III. The Limits Of Federal Preemption Under Gregory v. Ashcroft
¶ 11 Because the Oklahoma statute prohibits public bodies from using trustee banks who do not maintain trust offices staffed with trust officers in this State, the above analysis does not resolve the issue. The OCC, and the cases cited and discussed above, addressed only state statutes that generally restrict or prohibit national banks from engaging in fiduciary activities; they did not address more specific state laws that restrict national banks only with respect to any trust business with the State's own public bodies. See IL 866. The United States Supreme Court explained in Gregory that the power given to Congress to impose its will on the states through the Supremacy Clause of the Constitution "is an extraordinary power" that it would assume that "Congress does not exercise lightly."Gregory, 501 U.S. at 460. Gregory reiterated that the states "retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." Id. at 461. Thus, as noted above, Congress must make unmistakably clear its intent to "upset the usual constitutional balance of federal and state powers." Id.
 ¶ 12 Gregory concerned a Missouri constitutional provision that imposed a mandatory retirement age on state court judges.Id. at 456. Petitioners asserted that this provision violated the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634.Id. The Supreme Court observed that the state provision went "beyond an area traditionally regulated by the States; it is a decision of the most fundamental sort for a sovereign entity. Through the structure of its government, and the character ofthose who exercise government authority, a State defines itself as a sovereign." Id. at 460 (emphasis added). The Court acknowledged the "unique nature of state decisions that `go to the heart of representative government'" and how a state's "power and responsibility . . . applies not only to the qualifications of voters, but also to persons holding state elective andimportant nonelective executive, legislative, and judicialpositions, for officers who participate directly in theformulation, execution, or review of broad public policy performfunctions that go to the heart of representative government."Id. at 461-62 (citations omitted) (emphasis added). The Court concluded that "[i]n the face of [statutory] ambiguity, we will not attribute to Congress an intent to intrude on state governmental functions. . . ." Id. at 470.
¶ 13 Applying Gregory in its determination whether the federal Telecommunications Act preempted a Texas statute prohibiting municipalities from providing telecommunications services, the District of Columbia Circuit Court of Appeals opined that "[w]hatever the scope of congressional authority in this regard, interfering with the relationship between a State and its political subdivisions strikes near the heart of State sovereignty." City of Abilene v. FCC, 164 F.3d 49, 52 (D.C. Cir. 1999). The court explained that "in Texas `home rule' cities like the city of Abilene, although deriving their powers from the state constitution, are subject to state legislative restrictions on those powers." Id. The court relied on Sailors v. Board ofEducation, 387 U.S. 105 (1967) in reaching its conclusion that "the relationship between a State and its political subdivisions strikes near the heart of State sovereignty." See City ofAbilene, 164 F.3d at 52.
¶ 14 In Sailors, the United States Supreme Court observed that:
 "Political subdivisions of States — counties, cities or whatever — never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental function. As stated by the Court in Hunter v. City of Pittsburgh, 207 U.S. 161, 178 . . . these governmental units are `created as convenient agencies for exercising such of the governmental powers of the state, as may be entrusted to them,' and the `number, nature and duration of the powers conferred upon (them) * * * and the territory over which they shall be exercised rests in the absolute discretion of the state.'"
Id. at 107-08 (quoting Reynolds v. Sims, 377 U.S. 533, 575
(1964)) (emphasis added).
¶ 15 City of Abilene concluded to claim that the federal statute "bars Texas from limiting the entry of its municipalities into the telecommunications business is to claim that Congress altered the State's governmental structure." Id. at 52. The court emphasized that "the relationship between a State and its municipalities, including what limits a State places on the powers it delegates, has been described as within the State's 1absolute discretion.'" Id. (citation omitted). The court held that the federal statute did not manifest, "with unmistakable clarity," Congress's intention to "reach into areas of State sovereignty." Id. The court interpreted Gregory to address "what to do when the text fails to indicate whether Congress focused on the effect on State sovereignty. Gregory's answer is-do not construe the statute to reach so far." Id. at 53;but see Mo. Mun. League v. FCC, 299 F.3d 949, 953, 955 (8th Cir. 2002) (reaching the opposite conclusion because the statute "satisf[ied] the Gregory plain-statement rule"; the use of "any" before the word "entity" signified Congress's intention to include all things that could be considered entities). The OCC's opinion does not discuss this important limitation on the preemptive effect of a federal statutory or regulatory scheme.See IL 866.
 IV. Conclusion
¶ 16 Here, as in Gregory and City of Abilene, construing Section 92a of the National Bank Act to preempt 6 O.S. 2001, §427[6-427] would be to claim that Congress intended to alter Oklahoma's governmental structure and "strike near the heart of State sovereignty." City of Abilene, 164 F.3d at 52. There is no indication in Section 92a that Congress intended to reach into this area of state sovereignty. In fact, Congress expressly conditioned the provision's reach on the reach of state law. Absent an expression of an unmistakable intention to "intrude on state governmental functions," Section 92a may not be construed to reach so far.[5] Gregory, 501 U.S. at 470.
¶ 17 Oklahoma's statute, 6 O.S. 2001, § 427[6-427], is distinguishable by its dual application. It not only prescribes requirements for banks or trust institutions serving as trustees of a bond issue of a public body in Oklahoma, it also requires Oklahoma public bodies issuing bonds to use the services of a trustee which has a presence in the State, by maintaining a trust office and having a trust officer located in Oklahoma. These public bodies are supported in whole or in part by State funds or entrusted with the administration of State funds. 2003 Okla. Sess. Law. Ch. 3, § 42(2) (amending 51 O.S. 2001, § 24A.3[51-24A.3](2)). These entities exercise significant authority and perform important State governmental functions, including issuing bonds to finance State or local government projects. Thus, these public bodies serve as "`convenient agencies for exercising such of the governmental powers of the state, as may be entrusted to them,' and the `number, nature and duration of the powers conferred upon (them) . . . rests in the absolute discretion of the state.'"Sailors, 387 U.S. at 108 (quoting Reynolds v. Sims,377 U.S. 533, 575 (1964)) (emphasis added). Accordingly, the State has the "power and responsibility" to make decisions to cabin their authority and their functions because they go "to the heart of representative government." Gregory, 501 U.S. at 462.
¶ 18 The cost of State and local government capital improvement projects for a public purpose, such as construction or improvement of water and sewer systems, airports, hospitals, highways, community centers and the like are often financed through issuance of bonds. Bond issuance allows the State or local government unit to have money in hand to finance an entire project, rather than piecemeal financing over a period of several years, resulting in economies of scale and savings in construction and interest costs. The most widely used form of financing instrument for public improvement projects is the revenue bond, whereby income from the use of the project, for example, water or sewer system revenues or road tolls, is used to pay debt service on notes or bonds issued to finance the project. In revenue bond financing a trustee bank is used to hold bond proceeds, control their disbursement for project purposes, hold project revenues such as water, sewer, toll revenues, or other project-derived income, and pay interest and principal amounts to bondholders in a timely manner.
¶ 19 The bond trustee administers the bond indenture or other written instruments authorizing and securing the bonds or notes.See J. Scott Brown, Utility, Hospital and other "Governmental"Revenue Bonds, in Oklahoma Municipal Bonds 140, 152 (Lynn C. Rogers ed., 3d ed. 1987); John P. Barron, The Role of theTrustee, in Municipal Bonds Reference Guide 82 (Council of Dev. Finance Agencies Stanley Provus Assoc., Inc. eds., 1998). The service of a trustee bank is essential in these transactions to promote investor confidence, assure proper use of bond proceeds and prompt payment of interest and principal to bondholders or other lenders, and generally help maintain a municipal bond market system under which governments may borrow money at economical rates.
¶ 20 Revenue bond issues almost universally require the services of a bank or trust company to hold monies on behalf of the governmental unit and make payments to bondholders. Such entities protect the interests of both the bond issuer and bondholders by assuring bond proceeds are properly spent by reviewing requisitions for disbursal of proceeds, and ensuring monies for debt service payments are properly gathered, appropriately invested and protected.
¶ 21 When a public trust or other public agency has issued revenue bonds for a project, the issuer deals on a regular basis with the trustee bank, often daily or weekly, to assure that revenues are timely and properly deposited, proceeds are properly requisitioned and disbursed for projects, bondholder payments are timely made, and reports of all activities are promptly and accurately made, so as to assure a proper accounting for all aspects of the transaction. See John P. Barron, The Role ofthe Trustee at 82-90. For these reasons, the ability of a governmental bond issuer to communicate, easily and reliably, with a bond trustee is essential. For example, if questions arise as to whether project revenues have been properly received and deposited on time, or whether a particular disbursement constitutes a proper use of bond proceeds under the documents authorizing the bonds, the treasurer or financial officer of the issuer may well telephone the trustee bank, or may visit the trustee bank's offices to have questions answered or to get assurances that aspects of the bond-financed transaction are being handled in a timely and fiscally responsible manner.
¶ 22 In conducting its financial affairs, a municipality or a public body has a responsibility to the public to exercise its powers in a prompt and efficient manner, just as a private provider would be required to do. Ex parte Houston,224 P.2d 281, 292 (Okla.Crim. 1950). Municipalities, clothed with the right of self-government since statehood, have authority to exercise their discretion on matters of purely local concern, except where the State has otherwise prescribed. City of Tulsav. Pub. Employees Relations Bd., 845 P.2d 872, 875 (Okla. 1990). Because the bank or trust institution is assisting the public body in properly, legally and constitutionally administering public funds, Oklahoma can require its physical presence in the State. The National Bank Act cannot displace Oklahoma's legislation to effectuate this public policy. See,e.g., First Nat'l Bank v. Dickinson, 396 U.S. 122, 138 (1969) ("Here we are confronted by a systematic attempt to secure for national banks branching privileges which Florida denies to competing state banks. . . . [M]any States permit state chartered banks to use this eminently sensible mode of operations, but Florida's policy is not open to judicial review any more than is the congressional policy of `competitive equality.'").
¶ 23 Title 6 O.S. 2001, § 427[6-427] otherwise "imposes no limitations on where [a national] bank may market its services or where the bank's fiduciary customers may be located." IL 866, at 7. It also permits national banks to "advertise and solicit customers for its fiduciary business" in Oklahoma. Id. at 8. Thus, the law does not "impermissibly conflict with" a national bank's "authority to solicit trust business or act as trustee in trust appointments" for private customers in Oklahoma, the primary concerns of the OCC. Id. at 10. Oklahoma's law regulates its State governmental functions and determines the relationship between the State, its public bodies and its governmental structure. The limits on the powers that Oklahoma confers upon its public bodies rest in the State's absolute discretion. The opinion of the OCC does not address preemption with respect to these areas of state sovereignty, and does not apply to the preemption determination.
¶ 24 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. The Office of the Comptroller of the Currency's Interpretive Letter No. 866 concludes those state laws that purport to prohibit or restrict a national bank from exercising its federal power to act as a trustee are preempted by the National Bank Act, 12 U.S.C. § 92a. However, the letter does not address state statutes that regulate political subdivisions or other public bodies of those states, as does 6 O.S. 2001, § 427, by prohibiting public bodies from employing, as trustees of bond issues, entities lacking an in-state trust office and trust officer.
 2. The United States Supreme Court has stated that unless the language of the statute is unmistakably clear, it will not attribute to Congress an intent to intrude on state governmental functions. Gregory v. Ashcroft, 501 U.S. 452, 461 (1991).
 3. Because Interpretive Letter No. 866 addresses neither state statutes such as 6 O.S. 2001, § 427, which implicate state sovereignty, nor the limitations on the preemptive effect of federal law on such statutes as explained by the United States Supreme Court, the Comptroller of the Currency's Interpretive Letter No. 866 does not apply to the preemption analysis used in this Opinion.
 4. Title 6 O.S. 2001, § 427[6-427] regulates Oklahoma's governmental functions and determines the relationship between the State, its public bodies and its governmental structure. The plain language of the National Bank Act, 12 U.S.C. § 92a, does not evince a clear intent by Congress to intrude on these governmental functions.
 5. Therefore, 12 U.S.C. § 92a does not preempt 6 O.S. 2001, § 427, which prohibits public bodies from employing, as trustees of bond issues, banks or trust institutions that do not maintain a trust office within this State, and a trust officer in that office.
 W.A. DREW EDMONDSON Attorney General of Oklahoma
 JOANN T. STEVENSON Assistant Attorney General
[1] "The Office of the Comptroller of the Currency (OCC) charters, regulates, and supervises all national banks. . . . The OCC was established in 1863 as a bureau of the U.S. Department of the Treasury. The OCC is headed by the Comptroller, who is appointed by the President, with the advice and consent of the Senate, for a five-year term." Available at
http://www.occ.treas.gov/aboutocc.htm (last visited Nov. 3, 2003).
[2] Available at
http://www.occ.treas.gov/interp/oct99/int866.pdf (last visited Nov. 3, 2003).
[3] Id. n. 2 at 5-8.
[4] Id.
[5] Also, the Supreme Court has elucidated the principle (in the context of the National Labor Relations Act) that actions taken by a state when it acts as a mere proprietor or market participant may avoid preemption. See Bldg. Constr. TradesCouncil v. Assoc. Builders Contractors, 507 U.S. 218, 227
(1993) ("When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption . . . because pre-emption doctrines apply only to state regulation."). Other courts have extended this principle to other federal laws. See,e.g., Cardinal Towing Auto Repair, Inc. v. City of Bedford,180 F.3d 686, 693-95 (5th Cir. 1999) (FAA Authorization Act and ICC Termination Act); Sprint Spectrum L.P. v. Mills,283 F.3d 404, 419-21 (2d Cir. 2002) (Telecommunications Act).
However, acts of a state as a "market participant" must be "in a narrow and focused manner" with an obvious connection to the state's "narrow proprietary interests" in its own efficient procurement of services because when "a state attempts to use its spending power in a manner `tantamount to regulation,' such behavior is still subject to preemption." Cardinal Towing,180 F.3d at 691, 692 (citation omitted). Courts have "shielded contract specifications from preemption when they applied to a single discreet [sic] contract and were designed to insure efficient performance rather than advance abstract policy goals."Id. at 693. Title 6 O.S. 2001, § 427[6-427] does not meet this test because the Legislature codified its directive that trustees for bond issues of public bodies have local trust offices and officers, making the directive a broad policy.