SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger and Douglas C. Brandon, Defendants.

Carl H. Loewenson, Jr., Esq., as Receiver for Credit Bancorp, Ltd., Credit Bancorp, N.V., and their subsidiaries and affiliated entities, Third–Party Plaintiff,

v.

Certain Underwriters at Lloyds, London, London Market Companies, Gulf Insurance Company, and Federal Insurance Company, Third–Party Defendants.

No. 99 Civ. 11395(RWS).

United States District Court, S.D. New York.

Nov. 20, 2002.

Securities and Exchange Commission, Salt Lake City, UT, By: Thomas M. Melton, for Plaintiff, of counsel.

Securities and Exchange Commission, New York, NY, By: Robert Blackburn, Local Counsel, of counsel.

Pattison & Flannery, New York, NY, By: Thomas R. Pattison, Paul C. Fonseca, for Third–Party Defendants, of counsel.

Morrison & Foerster, New York, NY, By: Carl H. Loewenson, Receiver and Fiscal Agent, for Receiver.

Dickstein Shapiro Morin & Oshinsky, New York, NY, By: Randy Paar, Edward Tessler, Ryan S. Luft, for Receiver, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Carl H. Loewenson, Jr. (the "Receiver"), as Receiver for Credit Bancorp, Ltd. and affiliated entities ("CBL") had moved to enforce a settlement agreement and this Court's order dated March 13, 2002 and is seeking a judgment for $205,237.26 plus interest from March 31, 2002, and attorney's fees against those· defendants who subscribed to the All Risk Policy (the "Underwriters"). The Underwriters have cross-moved pursuant to Rule 60(b) of the Federal Rules of Civil Procedure to amend the settlement to replace the $205,237.26 figure with an amount of $88,767.12

For the following reasons, the Receiver's motion is granted, and the Underwriters' cross motion is denied.

### Facts

Certain of the prior proceedings are described in previous opinions of this Court, familiarity with which is presumed. *See SEC v. Credit Bancorp, Ltd.,* 147 F.Supp.2d 238 (S.D.N.Y.2001); *SEC v. Credit Bancorp Ltd.,* 93 F.Supp.2d 475 (S.D.N.Y.2000).

On March 1, 2002, the Receiver and the Underwriters entered into a compromise and settlement of this action (the "Settlement Agreement"). The Settlement Agreement was negotiated over a several week period and was hotly debated, and finally approved by, the CBL customers. At issue is Paragraph 3 of the Settlement Agreement, which states:

... Insurers subscribing to Policy 509/ QR029198 shall pay the Receiver two hundred five thousand two hundred thirty-seven dollars and twenty-six cents (US$205,237.26) as a return of the unearned premiums (the "Returned Premiums"). This amount will be paid to the Receiver by check drawn on Pattison & Flannery's trust account no later than thirty (30) days after the date of this Agreement....

Settlement Agreement, ¶ 3. The $205,237.26 figure was based upon information provided to the Receiver's counsel by all attorneys for the Underwriters. As part of the settlement, the Receiver agreed not to seek return of that portion of the premium paid by Underwriters to the bro-

ker as commission. In addition, the Receiver agreed not to seek premium refunds on a number of other policies of the Underwriters. John P. Ryan, one of the experts the Receiver intended to call at trial, estimated that CBL should receive a total of $545,587, plus interest.[1]

By order dated March 13, 2002 (the "March 13 Order"), the Settlement Agreement was approved and "so ordered" by this Court.

During the six months prior to making this motion, counsel for the Receiver sought to collect the monies owed by the Underwriters pursuant to Paragraph 3 of the Settlement Agreement and the March 13 Order. The Underwriters explained that they were prepared to pay the amount, but Marsh & McClennan, acting as agents for the Underwriters, had not yet collected the funds.

By facsimile dated September 23, 2002, the Underwriters' counsel provided counsel for the Receiver with a new method of calculating the unearned premium. That calculation would result in a return of $88,767.12.

The Receiver states that the Underwriters have refused to pay the amount due and that they have said that they might not make any payment at all unless the Receiver agrees to accept the lower amount of $88,767.12 in satisfaction of the Underwriters' obligations under Paragraph 3.

The Receiver filed this motion on September 30, 2002, and it was considered fully submitted on October 9, 2002.

### The All Risk Policy

The All Risk Policy issued to CBL by the Underwriters provided coverage for losses up to $450 million for the period from August 1, 1998 through April 1, 2001. The premium, due in three yearly installments, was $450,000 per year. Accordingly, the premium installments due under the first and second years were $450,000 and a premium of $313,150 was to be paid for the third installment (pro-rated for the period from August 1, 2000 to April 1, 2001). These figures included a 25% brokerage fee.

CBL paid the first installment of $450,000. Effective on April 22, 1999, the All Risk Policy limit was amended downward to $300 million, and the premium was reduced to $225,000 per year for the remainder of the policy period. In accordance with pro-rata calculations, a return of unearned premium for the first year of coverage, in the amount of $62,260 was made to CBL. In addition, the premium installments owed for the second and third years became $225,000 and $156,575, respectively.

CBL paid the second premium installment payment of $225,000, constituting payment for the second year of coverage under the All Risk Policy.

On January 21, 2000, the Receiver was appointed and coverage accordingly terminated 173 days into the second year of coverage. The All Risk Policy stipulates in relevant part that "Underwriters shall, on request, refund to the Insured the unearned premium, computed pro rata, if this Policy be terminated or cancelled [by reason of the taking over of the Insured by a receiver]." Because coverage had been so terminated, the Receiver sought return of the unearned portion of the premium due. The Underwriters agreed that the unearned premium was to be returned.

---

1. That amount included $273,657 for the All Risk Policy, a figure that did not include a deduction of 25% for the brokerage commission. When the brokerage is subtracted from that amount, the net amount is approximately $205,240.

### The Calculation of the $205,237.26 Figure

The Underwriters derived the agreed-upon settlement figure from the following calculations and provided it to the Receiver in a letter dated November 20, 2001. First, CBL paid total premium payments of $612,740 to the Underwriters ($387,740 for the first year plus $225,000 for the second year of coverage). Next, the Underwriters calculated that no coverage was provided for 44.66% of the policy period, i.e., 192 days of the second year of coverage plus the third year of coverage divided by the total number of days of coverage, 1095. 44.66% of $612,740, less a 25% brokerage commission, equals $205,237.26.

### The Calculation of the $88,767.12 Figure

The Underwriters claim that several mistakes were committed above. First, they claim that the only payment figure that should have been looked at was the amount paid for the second year of coverage, $225,000. Further, they claim that the calculation of the amount of time of no coverage should be calculated by looking only at the second year. Thus, because no coverage was provided for 192 days, the Underwriters argue that 52.60273% of the $225,000, less the 25% brokerage commission, should be refunded. This calculation yields the $88,767.12 amount.

### An Alternative Figure: $160,319

In his reply papers, the Receiver points out that there is a third means of calculating the figure of unearned premiums. Over the two years of coverage, 191 of the 730 days were not covered. Thus, the Receiver argues that the formula could also have been approximately 26.16% of $612,740, or $160,319. Further, because the Receiver's agreement to forego brokerage commissions was part of the settlement in light of the $205,237.26 figure, he argues that the reduction should not apply to any of these new methodologies and thus did not subtract the 25% in brokerage commissions from the figure above.

### Discussion

#### I. The Settlement Is Not Ambiguous

██ "A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." *Meetings & Expositions Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir.1974); *see also Transtech Elecs. Pte. Ltd. v. NAS Elecs. Inc.*, 2000 WL 381428, at *2 (S.D.N.Y. April 13, 2000); *Cruz v. Korean Air Lines Co.*, 838 F.Supp. 843, 845–46 (S.D.N.Y.1993).

██ The Settlement Agreement provides that it is to be governed by New York law. Settlement Agreement, ¶ 13. In New York, a settlement agreement is construed according to general principles of contract law. *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir.1999); *Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 661 (2d Cir. 1994). Accordingly, the initial interpretation of the agreement is a matter of law for the Court to decide. *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996). The Court must construe the agreement in accordance with the intent of the parties, giving unambiguous words their plain meaning. *Bank of New York*, 35 F.3d at 661.

The question of ambiguity *vel non* must be determined from the face of the agreement without reference to extrinsic evidence. *Collins v. Harrison–Bode*, 303 F.3d 429, 433 (2d Cir.2002) (*citing Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998)). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person

who has examined the context of the entire integrated agreement." *Id.* at 433.

Paragraph 3 of the Settlement Agreement is unambiguous. The paragraph provides, in pertinent part, that the Underwriters "shall pay the Receiver ... US$205,237.26 as a return of unearned premiums." The Underwriters argue that because the figure $205,237.26 is in the same sentence as "as a return of unearned premiums," an ambiguity arises. The Court may only look to the other terms of the Settlement Agreement in order to determine whether ambiguity exists. There are no other uses of the term "as a return of unearned premiums" or "unearned premiums" that suggest that the $205,237.26 figure is not the "unearned premiums."

■ Because the agreement is unambiguous, the Court is "required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir.1993); *see also Alexander & Alexander Servs. Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998). Therefore, in the absence of reformation, the Underwriters are bound to pay the figure provided for in the Settlement Agreement.

## II. *The Underwriter's Cross–Motion is Rejected*

■ Under New York law, stipulations of settlement, especially those entered into in open court, are favored and not lightly cast aside. *Willgerodt v. Hohri,* 953 F.Supp. 557, 560 (S.D.N.Y.1997); *Hallock v. State,* 64 N.Y.2d 224, 230, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984). A party will be relieved from the agreement only where there is cause sufficient to invalidate the contract, such as fraud, collusion, mistake, or accident. *Geller v. Delta Air Lines, Inc.,* 717 F.Supp. 213, 215

(S.D.N.Y.1989); *Hallock,* 64 N.Y.2d at 230, 485 N.Y.S.2d 510, 474 N.E.2d 1178; *React Service Inc. v. Rindos,* 243 A.D.2d 552, 663 N.Y.S.2d 225, 226 (2d Dep't 1997).

■ Because the remedy of reformation presents the danger "that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract," the New York courts have "sharply limited" the remedy of reformation. *Collins,* 303 F.3d at 434 (*citing Chimart,* 66 N.Y.2d at 573–74, 498 N.Y.S.2d 344, 489 N.E.2d 231). "The proponent of reformation must 'show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties.'" *Id.* at 434 (*quoting Chimart,* 66 N.Y.2d at 574, 498 N.Y.S.2d 344, 489 N.E.2d 231 (*quoting George Backer Mgmt. Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 219, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978))); *see also Healy v. Rich Prods. Corp.,* 981 F.2d 68, 73 (2d Cir.1992) ("To reform a contract, mutual mistake must be established by clear and convincing evidence. Unilateral mistake alone will not justify reformation of an instrument.") (applying New York law).

■ The Underwriters claim here that the Settlement Agreement should be reformed to reflect the lower amount of unearned premiums because there was a mutual mistake and that was what the parties had intended. A mutual mistake occurs "when the parties have reached an oral agreement and, unknown to either, the subsequent writing does not express that agreement." *Loyalty Life Ins. v. Fredenberg,* 214 A.D.2d 297, 300, 632 N.Y.S.2d 901, 903 (3d Dep't 1995) (*citing Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986)). A common example of this situation is a scrivener's error. *Id.* (*citing Metropolitan*

*Life Ins. Co. v. Oseas*, 261 App. Div. 768, 27 N.Y.S.2d 65 (1st Dep't 1941); *Fahy v. Security Mut. Life Ins. Co.*, 74 A.D.2d 984, 426 N.Y.S.2d 184 (3d Dep't 1980)).[2]

The extrinsic evidence submitted by the Underwriters does not meet New York's stringent standard for reformation because it does not show "in no uncertain terms . . . exactly what was really agreed upon by the parties." *Chimart*, 66 N.Y.2d at 574, 498 N.Y.S.2d 344, 489 N.E.2d 231. To conclude that reformation should occur, it would have to be determined either that the parties agreed that the term "unearned premiums," or "Returned Premiums" was $88,767.12 or that the amount of "unearned premiums" or "Returned Premiums" should be calculated by the methodology presented by the Underwriters. In fact, the undisputed evidence shows that the parties agreed on the figure of $205,237.26 and the methodology used to reach that figure.

The Underwriters' argument relies on the unsupported notion that the parties mutually had in mind what certain terms in the equation should be: namely, that the total amount of premiums paid should only be those paid for the second year of coverage (as opposed to those paid for the first and second years), and that the pertinent figure is a fraction of that amount, determined by figuring out the percentage of days left uncovered only in the second year (as opposed to a percentage of days left uncovered in either the first and second or all three years). There is no evidence of this agreement.[3] In the absence of any evidence to support these contentions, this Court cannot assume that the parties had so agreed simply because the Underwriters claim that it was the most logical thing to do. Moreover, in light of the fact that the Receiver agreed to forgive (1) more than $270,000 in other potential unearned premiums, and (2) the brokerage commissions on the All Risk Policy, it is just as likely that the Underwriters, in the course of settlement, offered a generous figure based on the methodology that may or may not represent that actual "unearned premiums" as defined in the Policy. Further, the fact that three different methodologies—each with a logic of its own—have been presented to this Court underscores the fact that the Underwriters' formula was not the only potential means of calculating the figure.

---

**2.** The Underwriters rely on *Fahy*, but it is clearly distinguishable as involving a scrivener's error. There, the plaintiff applied for and was issued a life insurance policy under which she would receive, in addition to a death benefit, a monthly retirement income of $9 beginning at age 60. The annual premium was $39.61. Shortly thereafter, she changed the policy for one with a yearly premium of $19.25 and a $500 monthly retirement benefit. Upon reaching the appropriate age and after having paid $673.75 in premiums, the plaintiff sought to obtain her benefit. The insurance company claimed that the $500 monthly benefit was an obvious mistake, and the Court concurred. There was no similar disagreement about formulae to come up with the $500 dollar benefit; it was a matter of placing the wrong number in the form. Here, the correct number—as agreed to by the parties—was placed in the Settlement Agreement, but now the Underwriters contend that the agreed upon number was derived from an incorrect methodology.

**3.** In fact, the methodology agreed upon by the parties would suggest that if a different amount were intended—which the Underwriters have failed to prove—it would more likely be the $160,319 figure that the Receiver arrived at. The original calculation looked to the entire amount of premiums paid and the amount of time left of coverage as a fraction of the entire almost-three year period. Thus, modifying the agreed upon methodology to reflect that CBL had not paid for the third year of coverage, the proper equation would look to the entire amount paid over the two-year period and the amount of time left as a fraction of the two-year period of coverage.

■ What is at issue here appears to be, at most, a unilateral mistake on the part of the Underwriters. They forwarded a proposed methodology and figure to the Receiver, and the Receiver agreed to that methodology and figure. As part of the bargain and based upon the $205,237.26 figure, the Receiver agreed not to seek the 25% brokerage commissions from the Underwriters. However, the Underwriters since discovered that the methodology and figure on which the parties agreed was not the best bargain for the Underwriters. In order for a unilateral mistake to justify reformation, there must be evidence that the parties reached an agreement and—unknown to one party but known to the other, who has misled the first—the subsequent writing does not properly express that agreement. *E.g., Chimart,* 66 N.Y.2d at 573, 498 N.Y.S.2d 344, 489 N.E.2d 231. There is no evidence of any fraudulent misrepresentation on the part of the Receiver, nor do the Underwriters allege any. The Receiver did receive the methodology and numbers to input into the formula in November of 2001. There is no suggestion that he figured out the purported mistake and remained silent in order to get a better deal. Therefore, reformation cannot be had on this ground.

■ Finally, there is some suggestion that to enforce this bargain would be unfair to the Underwriters. When a contract does not violate public policy and its effect is not so onerous as to shock the conscience, a party will not be relieved of its duty to abide by the contract merely because it is a burdensome bargain. *Loyalty Life Ins.,* 632 N.Y.S.2d at 902–03 (*citing Backer Mgmt.,* 46 N.Y.2d at 218, 413 N.Y.S.2d 135, 385 N.E.2d 1062). Here, the Receiver has argued that another methodology using the same numbers as the Underwriters used, but over a two-year period, would result in a figure of $160,219. Further, even the Underwriters' number, without the benefit of the 25% reduction in brokerage commissions, is a hefty $118,356.16. These figures are not so far removed from the actually agreed upon settlement of $205,237.26 as to be unconscionable, particularly in light of the fact that the settlement was entered into at arms-length[4] by sophisticated parties represented by able counsel and because the Receiver agreed to forego more than $270,000 in other unearned premiums and the brokerage commission for the Policy. As a result, the Underwriters' motion to reform the Settlement Agreement is denied.

### Attorney's Fees

■ Sanctions such as attorney's fees are only appropriate where the subject party's conduct is "entirely without color" and "motivated by improper purposes." *Milltex Indus. Corp. v. Jacquard Lace Co.,* 55 F.3d 34, 35 (2d Cir.1995); *United States v. Int'l Brotherhood of Teamsters,* 948 F.2d 1338 (2d Cir.1991).

Although the Underwriters did not prevail, it cannot be said that their claim was entirely without color. Therefore, the Re-

---

4. The Underwriters cavil that the negotiation was not an "arms-length negotiation" because there was never an agreement that CBL would be entitled to something more than the actual value of unearned premiums actually paid into the Underwriters. The Underwriters' main concern appears to be with the "negotiation" aspect of that phrase, rather than the undisputable adjective, "arms-

length." In any case, even if the parties did not discuss whether the Receiver, on behalf of CBL, could receive more or less than the actual amount paid, there certainly was a negotiation regarding the settlement, and the opportunity to raise any such notions at that time. The Underwriters were hardly railroaded into signing a boilerplate without aid of counsel.

ceiver's motion for attorney's fees is denied.

### Conclusion

In light of the foregoing, the Receiver's motion to enforce the Settlement Agreement is granted and the Underwriters' motion to reform that agreement is denied. A judgment against the Underwriters in the amount of $205,237.26, plus interest since March 31, 2002, shall be entered.[5]

It is so ordered.

---

**5.** The Underwriters stated that they intended to tender the $88,767.12 figure to the Receiver as soon as they had received that amount in their account. If they have already paid that amount, the figure above should be so modified. The Underwriters nevertheless will remain liable for interest on the $88,767.12 from March 31, 2002 up until the time of payment.