Stan LEE, Plaintiff,

v.

**MARVEL ENTERPRISES, INC. and Marvel Characters, Inc., Defendants.**

**No. 02 Civ. 8945(RWS).**

United States District Court, S.D. New York.

Jan. 17, 2005.

---

Dickstein Shapiro Morin & Oshinsky, New York, NY (Howard Graff, Judith R. Cohen, Burt Garson, of counsel), for plaintiff.

Paul, Hastings, Janofsky & Walker, New York, NY (David Fleischer, Jodi A. Kleinick, John M. Magliery, of counsel), for defendant.

## OPINION

SWEET, District Judge.

The defendant Marvel Enterprises, Inc. ("Marvel") has moved for partial summary judgment in accordance with Rule 56(a), Fed.R.Civ.P., dismissing the claims in the complaint seeking a profit participation from licensing of its characters for merchandising. The plaintiff Stan Lee ("Lee") has cross-moved for partial summary judgment declaring that he is entitled to 10% participation in profits derived by Marvel from television or movie productions, not limited by so-called "Hollywood Accounting," including film/television merchandising when the profits do not result from a fee for licensing. For the reasons set forth below, Marvel's motion is denied, and Lee's cross-motion is granted in part and denied in part.

As of the time these motions were filed, Lee continued to serve as Marvel's chairman emeritus. As discussed below, Lee has contributed significantly to Marvel's growth since his initial employment in 1940. Initially, Marvel's predominant business was publishing comic books, many of which featured characters created by Lee—*e.g.* Spider–Man, the Incredible Hulk, the X–Men, and the Fantastic Four.

Marvel has subsequently expanded the use of its characters into movies, television, and merchandising. Lee had a contract with Marvel that permitted him to share in certain of these endeavors. Marvel then suffered the vicissitudes of a control contest and bankruptcy. When it emerged from bankruptcy with new leadership, it entered into a new contract with Lee (the "Agreement"). It is paragraph 4(f) of the Agreement, executed on November 17, 1998, that is the central focus of the present action. Paragraph 4(f) states:

> [Lee] shall be paid a participation equal to 10% of the profits derived during [his] life by Marvel (including subsidiaries and affiliates) from the profits of any live action or animation television or movie (including ancillary rights) productions utilizing Marvel Characters. This participation is not to be derived from the fee charged by Marvel for the licensing of the product or of the characters for merchandise or otherwise....

(Cohen Aff. Ex. 1 at 5.) This deceptively simple language, drafted by a company and an executive both skilled and experienced in the industry, has given rise to a multimillion dollar controversy because of changes in the way Marvel has conducted business since the execution of the Agreement in November, 1998.

According to Marvel, paragraph 4(f) entitles Lee to 10% participation in only those television and motion picture production deals where Marvel has been afforded rights of net profit participation. (Such net profit participation arrangements are commonly referred to as "Hollywood Accounting" deals.[1]) Lee argues

---

1. One commentator has provided the following description of the typical provisions of a "Hollywood accounting" deal:

 [T]he basic net profits formula subtracts from the studio's (distributor's) adjusted gross receipts the production costs, distribution expenses, and distribution fees.... Production costs are all costs directly at-

 tributed to the particular film (plus overhead). Production costs include the payments to all other participants in a film including the contingent compensation of gross participants. So, for example, [if a given actor] had fifteen gross points for [a given movie] (that is, he received 15% of the gross receipts), every dollar of revenue

that paragraph 4(f) entitles him to 10% of all profits—including gross profits or gross proceeds—derived from contingent payments to Marvel in connection with the use of Marvel characters in film or television productions.

According to Marvel, pursuant to the second sentence of paragraph 4(f), Lee is barred from any profits from merchandising. According to Lee, he is entitled to participate in all revenue from film/television merchandising with the exception of profits resulting from fees from licensing for merchandise.

Skilled counsel for both sides praise the clarity of the language of paragraph 4(f) to reach directly contrary results. What follows is an effort to clarify and determine the terms of the contractual language under the applicable principles of procedure and construction. This determination has the potential to affect substantially the financial fortunes of the parties.

### Prior Proceedings

Lee commenced the instant action against Marvel and Marvel Characters, Inc. ("Characters") on November 12, 2002.[2] In his first cause of action, Lee seeks damages as a result of the alleged breach of paragraph 4(f) and also of paragraph 2(c), which Lee contends entitles him to be named executive producer or co-executive producer of any movie or television production utilizing Marvel characters. (Lipson Decl. Ex. 3 at ¶¶ 34–37.) In his second cause of action, Lee seeks damages as a result of Marvel's alleged breach of a duty of good faith and fair dealing. (Id. at ¶¶ 38–43.) In his third cause of action,

Lee seeks an order directing Marvel to comply with its alleged obligation to pay him amounts owed pursuant to the Agreement and to provide him with an accounting. (Id. at ¶¶ 44–46.) In his fourth cause of action, Lee seeks a declaration of his rights regarding the participation payable to him under the Agreement. (Id. at ¶¶ 47–50.)

In discovery, Lee propounded various document requests and interrogatories to Marvel in which Lee requested that Marvel produce and identify, inter alia, all documents concerning Marvel's merchandising agreements and payments received by Marvel in connection with merchandising relating to movie and television productions.

Upon the October 22, 2003 argument on a motion to compel discovery that turned on interpretation of Lee's rights under the Agreement, it was concluded that the proper construction of the Agreement would be better addressed in the context of a motion for summary judgment. The instant motion by Marvel to bar Lee from profits arising out of merchandising and Lee's cross-motion to obtain profits from film/television productions and from certain film/television merchandising were heard and marked fully submitted on September 8, 2004.

### The Parties

Lee became employed by Marvel's predecessor in interest in 1940 and, with the exception of approximately two years in the early 1940's when he served in the military service and one month in 1998, he has remained in Marvel's employ ever

---

that the film generated pushed the net profits breakeven point back fifteen cents. Thus, if a film has significant gross participants, the breakeven point quickly recedes. Almost all the box office smashes that failed to produce net profits had significant gross participants.

Victor P. Goldberg, The Net Profits Puzzle, 97 Colum. L.Rev. 524, 528–529 (1997).

2. On September 18, 2003, Lee and Marvel entered into a stipulation dismissing the action with prejudice with respect to Characters. The stipulation was so-ordered by the Court on October 16, 2003.

since. During this period, Lee created or co-created Marvel characters including the X–Men, the Incredible Hulk, Daredevil, the Fantastic Four, Iron Man, Doctor Strange, the Silver Surfer, and Spider–Man. Lee's various roles at Marvel have included editor, art director, head writer, and publisher. In 1980, Lee moved from New York to California to set up and run Marvel's animation studio and to pursue Marvel's involvement with television and motion pictures.

Marvel and its predecessors in interest started out in the business of publishing comic books based on fictional characters in 1938. The first Marvel character to be used in another medium was Captain America, which was featured in a 1944 motion picture serial produced by Republic Pictures. In the 1960's, Marvel expanded its business to include the merchandising of consumer products utilizing Marvel characters. In 1966, a half-hour animated cartoon series produced by the Grant–Ray–Lawrence Company called *The Marvel Super Heroes* was syndicated to television stations around the country. Between 1967 and 1970, half-hour television programs featuring The Fantastic Four and Spider–Man appeared on the ABC television network each Saturday morning.

By the late 1970's, the licensing of Marvel characters for merchandise had become a principal line of Marvel's business, and Marvel had entered into agreements with third parties to license its characters for use in connection with dozens of types of consumer products. Marvel's Los Angeles office sought to promote Marvel characters for television and movies, and it continued its efforts to license such characters to third parties for use in connection with television and movie productions.

Marvel was in bankruptcy from December 1996 through October 1998. During this period Ronald Perelman, Carl Icahn, and ToyBiz, Inc. ("ToyBiz") sought control of Marvel. ToyBiz prevailed in this contest.

### The Agreement And Subsequent Events

Prior to the 1994 bankruptcy, the parties entered into an agreement granting Lee a share of Marvel's profits. In 1995, pursuant to this agreement, Marvel paid Lee a 10% participation, which was based on revenue received by Marvel under an arrangement with Danchuk Productions. Under this arrangement, Lee received a percentage of gross receipts. The payments to Marvel were characterized as "profit participation." Marvel remitted 10% ($4,994) to Lee without any deduction for costs. Marvel stated to Lee that this sum "represent[ed] your 10% of the profits." (Cohen Aff. Ex. 23.) The executory portion of this prior agreement was rejected by Marvel during the bankruptcy.

After Marvel emerged from bankruptcy, the parties on November 17, 1998 executed the Agreement.

In addition to paragraph 4(f), the Agreement contains other relevant provisions. Under paragraph 2, Lee is required to devote ten to fifteen hours per week to Marvel's affairs. As consideration for his services, Lee is entitled to receive an annual base salary of $810,000 for the years beginning November 1, 1998 and 1999, $850,000 for the year beginning November 1, 2000, $900,000 for the year beginning November 1, 2001, and $1,000,000 for the year beginning November 1, 2002 and each year thereafter until his death. Upon Lee's death, the Agreement provides for Lee's wife to receive survivor payments in an amount equal to 50% of Lee's base salary as of the time of his death through the time of her death, and for Lee's daughter thereafter to receive survivor payments of $100,000 per year for five years. Under paragraph 4(c) of the Agreement, Lee received 150,000 valuable stock options which Lee has already exercised for

a net gain of approximately $1.4 million. (Lipson Decl. ¶ 13, Ex. 2 at ¶ 4(c).)

Between November 17, 1998 and today, Marvel has entered into over a thousand merchandising agreements pursuant to which it has licensed to third parties the right to use its characters in connection with various toys, games, collectibles, apparel, interactive games, arcade games and electronics, stationery and school products, health and beauty products, snack foods and beverages, sporting goods, party supplies, and amusement destinations. Merchandising has generated hundreds of millions of dollars in revenue to Marvel during this period.

In August 1998, the film *Blade,* which was based on a Marvel character, was released. Despite the fact that *Blade* apparently generated considerable profits, Marvel was not entitled to participate in these profits based on the terms of the profit-participation provision of the production agreement. This profit-participation provision, which Marvel has characterized as a "Hollywood accounting" provision, entitled Marvel to a share of *Blade'*s "net profits," as that term was defined by the language of the production agreement. Marvel's Rule 30(b)(6) witness stated that "Hollywood accounting" can be interpreted "to mean that you will never see anything—you will never see— the company would not see any revenues from the studio . . . ." (Cohen Aff. Ex. 9 at 166). Marvel's chief creative officer, Avi Arad, testified that "Hollywood accounting is-is the term used to—studio's deduct everything possible out of film revenues, from cost of the movie to getting a star flowers to—you name it and its in there. And it's expensive and it's hard to monitor, and therefore I'm allergic to it." (*Id.* Ex. 8 at 78.)

Coincident with *Blade'*s box-office success, a determination was made by Marvel to avoid "Hollywood accounting" treatment for the use of the Marvel characters. In its 2001 annual report, Marvel advised that its new movie venture agreements were either "gross profit participation 'dollar one,'" "real profit participation," or "equity (ownership) interests in the films themselves." (*Id.* Ex. 5 at 1835.) As stated by Marvel, these new agreements "represent an exciting new source of high margin revenue and are a major departure from the past when [Marvel] made little or no money for such projects." (*Id.*)

Marvel's contract with Sony for use of the character Spider–Man (generally regarded as Marvel's most valuable asset) contained a gross-profit participation provision. *Spider–Man: The Movie,* which was released in May, 2002, proved to be a huge box-office hit, earning $114.8 million in its opening weekend (at the time, the largest domestic opening of all time) and more than $800 million in worldwide box-office gross. Based on these receipts, the profit participation provision that Marvel negotiated with Sony has yielded more than $50,000,000 to Marvel.

In its October 30, 2002 press release announcing Marvel's quarterly financial results, Marvel's then president and CEO, Peter Cuneo ("Cuneo"), stated that "Marvel's resurgence throughout 2002 has been supported by the overwhelming popularity and success of *Spider–Man: The Movie,* which has spurred licensing and toy revenues; the expanding scope of our publishing efforts; and our strong and growing line-up of entertainment projects scheduled for release in 2003 and beyond." (*Id.* Ex. 2. at 2.) As set forth in its 2002 annual report, Marvel's toy division alone reported over $100 million in sales of *Spider–Man: The Movie* toys. (*Id.* Ex. 3.) Marvel's 2003 results were similarly strong, driven by the popularity of the films *X–Men 2, Daredevil,* and *Hulk,* all of which

featured Marvel characters. (*Id.* Ex. 4 at 22).

During the relevant time period, the share price of Marvel's stock rose from a low of $1.44 in 2000 to a high of $31.64 in 2003. (*Id.* Ex. 5 at 1850, Ex. 6 at 8.) Arad told *The Wall Street Journal,* "All our projects will be profitable to Marvel in gross participation[.]" (*Id.* Ex. 7, Ex. 8 at 56.)

In a 2000 *Business Week* article, Marvel's spokesman stated that "today we're going for meaningful profit participation in movies." (*Id.* Ex. 24 at 2.) Another Marvel official, quoted in the same article, stated that Marvel was committed to negotiating television and movie production agreements in which "[Marvel will] be participating in the profits from dollar one." (*Id.*)

Marvel's 2001 annual report consisted of the company's Form 10–K financial statement and a letter to shareholders signed by Cuneo and Morton Handel ("Handel"), the chairman of Marvel's board of directors. (*Id.* Ex. 5.) The letter, which was filed with the SEC along with the 10–K (*id.* Ex. 25 at 42), reported:

> Marvel has leveraged its characters' universal awareness and appeal to position them as highly sought-after franchises within Hollywood, much like movie stars who can "open" a film and therefore command profit participation.

(*Id.,* Ex. 5 at 1835.) The letter went on to state that:

Marvel's agreements include either gross profit participation "dollar one," a real profit participation, or equity (ownership) interests in the films themselves. (*Id.*)

In a November 18, 2003 presentation to financial analysts that was allegedly attended by all of the Marvel officers who have provided testimony in connection with this action, Marvel described its current film production deals as providing to Marvel "gross profit participation 'dollar one.'" (*See, e.g., id.* Ex. 4 at 12.) A presentation to investors prepared in the last quarter of 2003 included a graphic depiction of an "Example of First Dollar Gross Profit Participation Economics." (*Id.* Ex. 21 at 12.)

At his November 20, 2003 deposition, Arad stated that the reference to "gross profit participation" in the 2001 annual report was confusing to him.[3] (*Id.* Ex. 8 at 74–75.) It should be noted that Arad is listed as a presenter at the November 18, 2003 presentation to analysts where the term "gross profit participation" was used to characterize film production agreements entered into by Marvel. (*Id.* Ex. 4 at 2.)

With respect to the statement in Marvel's 2001 annual report that "Marvel's [production] agreements include either gross profit participation 'dollar one,' a real profit participation or equity (ownership) interests in the films themselves[,]" Allen Lipson ("Lipson"), Marvel's 30(b)(6) witness, testified:

Q: Is that a true statement?

---

**3.** Arad stated that Lee should not participate in Marvel's participation in Spider–Man because it was a gross participation agreement. When he was shown the Spider–Man agreement he conceded that he had been wrong in assuming that there were no deductions taken off revenues before calculating the gross proceeds in which Marvel would participate un-

der the agreement (*id.,* Ex. 8 at 160–64, 179–81, 202) and that the way he used gross participation was not the way it was used in the Spider–Man agreement. (*Id.* at 202.) He also conceded that his assumptions about the *Hulk* agreement were incorrect. (*Id.* at 205–06.)

A: I would not call it a gross profit participation.

(*Id.* Ex. 9 at 119.)

Cuneo, co-author of the letter to shareholders contained in the 2001 annual report, stated that the letter's statement concerning the nature of Marvel's production agreements was not accurate. (*Id.* Ex. 25 at 51.)

Arad and Lipson both stated that the Spider–Man transaction did not constitute a "profit participation." (*Id.* Ex. 8 at 67–69, Ex. 9 at 116–17.) However, Lipson admitted that the deals for *Spider–Man: The Movie, Daredevil, Dr. Strange,* and *Hulk*—which he and other Marvel witnesses had characterized as "gross participation" deals—had provided for "gross profit participation," as the term had been used in both the 2001 shareholders letter and the November 18, 2003 presentation to analysts. (*Id.* Ex. 9 at 159–63.)

On the first day of his December 2, 2003 deposition, Lipson was questioned about the November 18, 2003 presentation to analysts. In particular, Lipson was questioned about the use of the term "gross profit participation" in a presentation by Marvel CFO Kenneth West ("West"):

Q: I take it that you think your use of the term "gross profit participation" is incorrect?

A: It's neither correct nor incorrect. You can call it anything you want. It shows exactly what he means.

(*Id.* at 126–27.)

Between the date of Lipson's deposition on December 2 and December 17, 2003, when West was deposed, the word "profit" was removed from Marvel's presentation to analysts. West, who had prepared the original slide (*id.,* Ex. 19 at 105–11), stated that he had no idea how that change had come about. (*Id.* at 109.) After the deposition's lunch break, he characterized his usage initially and in the investor presentation as a "misnomer[,]"; and he stated that his colleagues also had misused the word in the 2001 annual report. (*Id.* at 113–14.)

According to plaintiff's expert Steven D. Sills, a certified public accountant familiar with film industry compensation agreements, consistent with industry custom and usage, profit participation comes in a wide variety of forms, from standard net profits to first-dollar gross profits. According to Sills, the grant of a profit participation simply means that the recipient is entitled to a share of some defined amount:

Whether that sharing is net profits, defined proceeds, gross after breakeven, rolling breakeven or adjusted gross receipts, it is still a profit participation as that term is used in the motion picture and television business.

(Sills Decl. ¶ 3.) This definition of "profit participation" is disputed by certified public accountant Franklin R. Johnson ("Johnson"), who is similarly experienced in the entertainment industry. According to Johnson, it is understood in the entertainment industry that the participant in a profit participation agreement "will not receive any compensation unless the project is profitable to the studio (i.e., unless the studio is able to recoup its production and distribution costs from gross proceeds)...." (Johnson Decl. ¶ 3.)

Relevant trade publications have reported on the "gross profit participation" garnered by leading actors and actresses and others with leverage in the entertainment industry. For example, *Variety* described the Marvel/Sony deal for *Spider–Man: The Movie* as a "first-dollar gross-profit participation." (Cohen Aff. Ex. 22 (quoting Janet Shprintz, *Spider–Man Breaks Free of Legal Web,* Variety, March 14, 1999 at 4).) An accounting publication stated, "[a]s an artist becomes more successful, he or she may move from no par-

ticipation to net profit participation to a succession of improving gross profit participation agreements." (*Id.* (quoting Ross Bengel & Bruce Ikawa, *Where's the Profit? accounting for net profit participation in film industry,* Management Accounting (USA), January, 1997).)

Under Marvel's Spider–Man agreement with Sony, Marvel reserved all merchandising rights and then contributed these rights to a or limited partnership known as Spider–Man Merchandising LP (the "joint venture" or "LP"). This entity is owned 50% by Sony and 50% by Marvel, and Marvel is entitled to 50% of its profits. (Cohen Aff. Ex. 9 at 91–93.)

Marvel reported in its 2003 form 10–K financial disclosure that it received as its share of LP's profits $10.9 million in 2003 and $13.8 million in 2002. (*Id.* Ex. 6 at 14.)

Under the agreement with Sony for Spider–Man, Marvel has not contributed to the LP and has reserved for itself the right to manufacture and sell movie and series-related toys, with the LP expressly licensing to Marvel such rights as are necessary for Marvel to do so. (*Id.* Ex. 27 at ¶ 11a(ii)(B).) As set forth in Marvel's 2003 10–K, these toys are produced by or for Marvel's ToyBiz division (*id.* Ex. 6 at 11.) For 2002 alone, ToyBiz had $100 million in sales of *Spider–Man: The Movie* toys. (*Id.* Ex. 3). Marvel's CFO West confirmed that these sales do not represent fees charged by Marvel. (*Id.* Ex. 19 at 82.) Marvel pays royalties to Sony in connection with such sales. (*Id.* Ex. 3 at 13.)

Under the agreement between Universal Pictures and Marvel for *Hulk,* Universal handles all film-related international merchandising, with the revenues therefrom to be split evenly after certain deductions by Universal. (*Id.* Ex. 31.) Through August 31, 2003, Marvel had received almost $2,000,000 from this arrangement. (*Id.,* Ex. 32.)

## *Discussion*

Jurisdiction in this case is based on the diversity of the parties. Lee is an individual residing in California. Marvel is a Delaware corporation with its principal place of business in New York State. The Agreement has a choice of law clause that provides that New York law governs all issues of contractual interpretation. (Lipson Decl. Ex. 1 at ¶ 8.)

### A. *The Summary Judgment Standard*

Under Fed.R.Civ.P. 56(c), a motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 461 (2d Cir.1994); *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991).

 Summary judgment is appropriate for the interpretation of unambiguous contract language. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 970 F.2d 1138, 1147 (2d Cir.1992) (affirming district court's grant of summary judgment and noting that "[w]here the language of a contract is clear, summary judgment is appropriate"), *aff'd,* 510 U.S. 86, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993); *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992) ("When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity"); *Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 572, 498 N.Y.S.2d 344, 346, 489 N.E.2d 231, 233 (1986) (stating that the interpretation of an unambiguous contract provision is a question of law for the court). Summary judgment is also appropriate " 'when the [contractual] language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence cre-

ates no genuine issue of material fact and permits interpretation of the agreement as a matter of law,'" *Shepley v. New Coleman Holdings Inc.,* 174 F.3d 65, 72 n. 5 (2d Cir.1999) (quoting *Nycal Corp. v. Inoco PLC,* 988 F.Supp. 296, 299 (S.D.N.Y. 1997) (applying New York law), *aff'd,* 166 F.3d 1201, 1998 WL 870192 (2d Cir.1998)).

Under New York law, "the initial interpretation of a contract is a matter of law for the court to decide." *Wausau Business Ins. Co. v. Turner Construction Co.,* 143 F.Supp.2d 336, 342 (S.D.N.Y.2001) (citing *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir. 1996)). Determining whether the terms of the contract are ambiguous is part of this initial interpretation. *Id.* (citing *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990) and *Garza v. Marine Trans. Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988)); *World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 184 (2d Cir.2003) (stating that whether contractual language is ambiguous is a question of law for the court); *Compagnie Financiere de CIC v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 232 F.3d 153, 158 (2d Cir.2000) (stating that "whether the language of a contract is clear or ambiguous is a question of law to be decided by the court"); *SEC v. Credit Bancorp, Ltd.,* 232 F.Supp.2d 260, 264 (S.D.N.Y.2002), *aff'd sub nom. Loewenson v. London Market Cos.,* 351 F.3d 58 (2d Cir.2003).

Contract language is only ambiguous when, viewed objectively, more than one meaning may reasonably be ascribed to the language used. *See, e.g., Gomez v. Local 144,* No. 95 Civ. 5755(RWS), 1995 WL 731628 at *3 (S.D.N.Y. Dec.11, 1995) (granting summary judgment after construing an unambiguous contract); *Nissho Iwai Europe PLC v. Korea First Bank,* 99 N.Y.2d 115, 122, 752 N.Y.S.2d 259, 264, 782 N.E.2d 55, 60 (2002) (stating that ambigui-

ty arises only from "what was written so blindly and imperfectly that its meaning is doubtful").

"[A] contract should be construed in light of its objective, and should not be read in a fashion that defeats its purpose," *Allen v. WestPoint–Pepperell, Inc.,* Nos. 90 Civ. 3841(SAS), 89 Civ. 2016(SAS), 1996 WL 2004 at *6 (S.D.N.Y. Jan. 3, 1996). A contractual provision "may not be interpreted in a manner which would render it an absurdity." *Saffire Corp. v. Newkidco., LLC.,* 286 F.Supp.2d 302, 308 (S.D.N.Y.2003). Likewise, unfair and anomalous results are to be avoided. *See, e.g., In re National Basketball Ass'n,* 630 F.Supp. 136, 140 (S.D.N.Y.1986) (citing *Browning–Ferris Industries of New York, Inc. v. County of Monroe,* 103 A.D.2d 1040, 1041, 478 N.Y.S.2d 428, 430 (4th Dep't 1984), *aff'd,* 64 N.Y.2d 1046, 489 N.Y.S.2d 902, 479 N.E.2d 247 (1985)). A chief objective of interpretation is "to avoid a result which places one party at the mercy of the other." *Id.*

Marvel has controverted certain of Lee's statements of material fact. However, any statement controverting a statement of material fact "must be followed by citation to evidence which would be admissible ..." Rule 56.1(d), Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. Marvel has failed to comply with this requirement. Instead, it has attempted to controvert Lee's Rule 56.1 Statement by (1) stating that "there exists genuine issues of material fact to be tried with respect to the facts alleged in the following paragraphs of Lee's Rule 56.1 Statement," and (2) providing a list comprised largely of citations to paragraphs of Lee's Rule 56.1 Statement. Moreover, Marvel has come forward with virtually no evidence to refute the evidence that Lee has proffered. Under these circumstances, the facts set forth in Lee's Rule 56.1 Statement are

largely deemed admitted. *Loucar v. Boston Mkt. Corp.*, 294 F.Supp.2d 472, 478 (S.D.N.Y.2003); *Spina v. Our Lady of Mercy Med. Ctr.*, No. 97 Civ. 4661(RCC), 2003 WL 22434143 at *2 n2 (S.D.N.Y. Oct. 22, 2003).

**B. *Profit Participation Pursuant To The First Sentence Of Paragraph 4(f) Is Not Limited to Net Profit Participation.***

 According to Lipson, Marvel's 30(b)(6) witness, Marvel's construction of the first sentence of paragraph 4(f) is based on the plain meaning of the text. According to Lipson, Lee is entitled to participation pursuant to paragraph 4(f) only when a payment by a studio (or producer) to Marvel is the result of a calculation of profit based on "Hollywood Accounting." Marvel argues that Lee is not entitled to share in profits arising from the contingent compensation provision in the Spider–Man agreement (and others like it) because such provisions entail participation in gross receipts and not profits.

However, the first sentence of paragraph 4(f) does not state that Lee's participation is limited to net profits earned by the producer or studio. Nor is the word "profits" defined in the Agreement. Moreover, the first, and therefore preferred, dictionary definition for "profit" is "an advantageous gain or return; benefit" (*The American Heritage College Dictionary* (3d ed.2000)); or "a valuable return: gain." (*Merriam–Webster Online Dictionary*). As demonstrated by the evidence proffered by Lee, these dictionary definitions are consistent with Marvel's own consistent practice in treating all forms of contingent compensation as profit participation.

In short, the first sentence of paragraph 4(f) is not ambiguous.[4] It provides that Lee is entitled to share in the results of Marvel's arrangements for movie and television productions involving Marvel characters, however those arrangements may have been characterized as between Marvel and the third party, as long as there is a valuable gain or return, a benefit to Marvel.

It is also apparent that a determination of the profits to which Lee is entitled cannot be made on the basis of the present record.

**C. *"Ancillary Rights" Include Merchandising***

 The parties differ as to whether the term "ancillary rights," as used in the first sentence of paragraph 4(f), includes merchandising rights. According to Marvel, pursuant to the first sentence of paragraph 4(f), "ancillary rights" are properly defined as whatever rights are granted by Marvel to a licensee under a given film/television production agreement. Marvel argues that "ancillary rights" neither necessarily include nor exclude merchandising; rather, the terms of each individual film or television production agreement determines the substance of these rights. In contrast, Lee argues that the phrase "ancillary rights" describes all rights beyond a film/television production's initial intended distribution, and that such rights are understood in the entertainment industry to necessarily include merchandising.

As set forth by both parties' experts,[5]

---

4. Even if the first sentence of paragraph 4(f) were ambiguous, the extrinsic evidence proffered by Lee would permit interpretation of the agreement as a matter of law. *See Shepley*, 174 F.3d at 72 n. 5.

5. It is appropriate to consider expert testimony of custom and usage to inform the interpretation of a contractual term. *See, e.g., Am. Nat'l Fire Ins. Co. v. Mirasco*, 265 F.Supp.2d 240, 252 (S.D.N.Y.2003); *see also Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309

the phrase "ancillary rights" includes rights ancillary to the basic film or television production itself. (Sills Decl. ¶ 6; Johnson Decl. ¶ 4.) According Lee's expert, it is understood in the motion picture and television industries that such "ancillary rights" include soundtrack, music, and merchandising revenues. (Sills Decl. ¶ 6.) Although Marvel's expert asserts that "there is no fixed and accepted definition" of the term "ancillary rights" he admits that the term is understood in the entertainment industry to include "all rights beyond the right to produce and distribute the motion picture for theatrical release." (Johnson Decl. ¶ 4.) Furthermore, Marvel's expert states that "there are instances where merchandising rights are expressly excluded from the grant of ancillary rights[,]" thereby strongly suggesting that, in general, ancillary rights are understood to include merchandising. (*Id.*)

Based on this expert testimony proffered by Lee and Marvel concerning common usage in the relevant industries, it is determined that the phrase "ancillary rights," as used in the first sentence of paragraph 4(f), necessarily includes merchandising rights.

**D.** *The Agreement Excludes Fees from Licensing From The Profit Participation Calculation*

■ The second sentence of paragraph 4(f) states: "This participation is not to be derived from the fee charged by Marvel for the licensing of the product or of the characters for merchandise or otherwise." Contrary to the interpretation urged by Marvel, this sentence does not bar Lee's participation in any and all merchandising revenue derived by Marvel. By its plain language, the sentence only excludes Lee's

participation in "fee[s] charged by Marvel for ... licensing[.]"

Furthermore, if Marvel's proposed construction were adopted, and the second sentence of paragraph 4(f) were to be read as barring Lee's participation in any and all merchandising revenue, it would have the effect of nullifying the first sentence's grant of "ancillary rights," which the court has concluded necessarily include merchandising rights. Pursuant to applicable rules of contractual interpretation, such a construction—*i.e.*, one that renders a contractual term superfluous—should be avoided. *See, e.g., Greater Eastern Transport LLC v. Waste Management of Conn., Inc.*, 211 F.Supp.2d 499, 503 (S.D.N.Y. 2002) (stating that when interpreting a contract, a court should "read meaning into each provision of [the] contract, if possible").

In the alternative, Marvel argues that in context of the second sentence of paragraph 4(f), the phrase "fee[s] charged by Marvel for ... licensing" means:

*any* and *all* revenue received by [Marvel] from its licensee in exchange for [Marvel's] grant of the rights to use its characters for merchandising ... regardless of whether the fee is in the form of a one-time payment, a percentage royalty based on sales, an interest in the entity to which the rights were granted, or a combination of these payment structures.

(Marvel Opp. Mem. at 4 (emphasis in original).) Lee does not seriously dispute the validity of this alternative construction of the phrase "fee[s] charged by Marvel for ... licensing." On this basis, Marvel's alternative construction of the phrase is adopted.

F.3d 76, 87 n. 4 (2d Cir.2002) (citing *Morgan Stanley Group Inc. v. New England Ins. Co.,* 225 F.3d 270, 275 (2d Cir.2000)).

This construction not withstanding, Lee argues that he is entitled, as a matter of law, to participation in the revenues generated by the following three merchandising ventures: (1) the marketing of film/television merchandise by Marvel's ToyBiz division, (2) the marketing of *Spider–Man: The Movie* merchandise by LP (a Sony/Marvel joint venture), and (3) the *Hulk* merchandising arrangement entered into by Marvel and Universal.

Marvel has conceded that its profits from the manufacture and sale of movie-related toys by its own ToyBiz division are not covered by the language of the second sentence of paragraph 4(f), characterizing this as the "only arrangement arguably not covered by the plain language of the merchandising exclusion." (Marvel Opp. Mem. at 5.) Marvel's explanation that it "believes" that the merchandising exclusion was nonetheless intended to cover these activities (*Id.* at 6) is submitted without any evidentiary support. That unsupported belief will not forestall summary judgment. *Saffire Corp. v. Newkidco, LLC,* 286 F.Supp.2d 302, 306 (S.D.N.Y.2003).

However, triable issue of fact do exist as to whether Lee is entitled to share in the profits from the LP and the *Hulk* merchandising ventures. Neither party has established whether either of these ventures involved the grant of a license by Marvel to a third-party for the use by that party of Marvel characters in merchandise.

Discovery related to Marvel's film/television merchandising arrangements and the revenues derived therefrom should assist in differentiating between such revenues derived from licensing transactions (*i.e.,* revenues in which Lee is *not* entitled to participate) and such revenues that were not derived from licensing transaction (*i.e.,* revenues in which Lee *is* entitled to participate).

*Conclusion*

Based on the foregoing, Lee's motion for partial summary judgment is hereby granted in part and denied in part. Marvel's motion for partial summary is hereby granted with respect to its proposed alternative construction of the phrase "fee[s] charged by Marvel for . . . licensing," and denied with respect to all other issues.

It is so ordered.